Harry McLACHLAN et al., Appellants,

v.

H. R. STROUBE et al., Appellees.

No. 3408.

Court of Civil Appeals of Texas.

Eastland.

May 8, 1959.

Rehearing Denied May 29, 1959.

Park, Hemphill & Auforth, Snyder, Crenshaw, Dupree & Milam, Lubbock, Black & Stayton, Austin, for appellant.

Turner, Rodgers, Winn, Scurlock & Terry, Dallas, Robert R. Patterson, Renal B. Rosson, Snyder, Roe, Ralston & Mc-Williams, Corsicana, for appellee.

GRISSOM, Chief Justice.

Harry McLachlan and others sued H. R. Stroube and others for the purpose of having construed a royalty reservation in an assignment of an oil and gas lease

from the McLachlans to the Stroubes, to have determined the effect of commitment of the tract to a unit operation and water flooding program and to recover engineering expenses alleged to have been required by improper conduct of defendants. The McLachlans asserted a right to recover royalty from oil produced by a water flood unit and allocated to the tract in which they own royalty based on $7/16$ths of the oil which was being produced from fourteen wells and a $7/32$nds from two other wells when said unit began water flooding. The court disregarded certain answers of a jury and rendered judgment that the McLachlans recover nothing on their claim for engineering expenses; that they recover nothing on their claim for an additional $7/32$nds overriding royalty on well number 8 from June 1, 1955, to January 1, 1957 and that the McLachlans recover after January 1, 1957, when the McLachlans joined the unit, only $7/32$nds of the oil produced from the unit and allocated to "Tract 5", (on which the McLachlans had assigned an oil and gas lease to the Stroubes,) until the gross monthly production allocated to Tract 5 is less than 14,400 barrels, when the McLachlans will recover only $7/64$ths thereof. The McLachlans have appealed.

In December, 1949, the McLachlans assigned to the Stroubes an oil and gas lease on "Tract 5" for a consideration of $125,000.00 cash, a development contract and a royalty exception in the assignment as follows:

"There is, however, reserved unto the Assignor, Leonard McMahon, Trustee, his successors and assigns, and excepted from this assignment and not conveyed hereby:

"(a) Seven-sixteenths ($7/16$ths) over-riding royalty from the total eight-eighths ($8/8$ths) production of oil from the lands in said lease described if, as and when produced, saved and marketed, but subject to the other provisions herein contained.

"I (b) If at any time any well on said lands does not by its *natural flow* produce its oil allowable after a thirty-day test period, then the seven-sixteenths ($7/16$ths) over-riding royalty herein reserved shall be reduced and there shall then only be reserved by and payable to assignor hereunder from such well or wells a seven-thirty-seconds ($7/32$nds) over-riding royalty; I and provided any well on said lands produces less than thirty (30) barrels per day for thirty (30) consecutive days, then in such event the over-riding royalty reserved by and payable to assignor from any such well or wells shall be reduced and there shall only be reserved by and payable to assignor hereunder from any such well or wells a seven sixty-fourths ($7/64$ths) over-riding royalty."

The development contract referred to said assignment. It recited that the consideration for said assignment was as follows:

"Payment in cash to said Trustee by Second Parties of the sum of $125,000.00 in cash, the receipt of which is hereby acknowledged and confessed; and (1) $7/16$ths over-riding royalty from the total $8/8$ths production of oil from the lands in said lease described, if, as and when produced, saved and marketed; (2) $7/16$ths over-riding royalty from the total $8/8$ths production of any liquified oil by-product which has a market value at the well and can be produced and sold at the well without any additional cost or expense to produce, sell and market same; and the further consideration of the following agreement on the part of said Second Parties to drill on said lands for the purpose of oil, gas and other minerals and to develop said lands according to the following agreement."

There followed an agreement that the Stroubes would commence drilling a well

within thirty days after title was approved; that, if production were obtained from the first well, the Stroubes would cause the well to be tested by the Railroad Commission and if, "after 30 days from such test", said well would produce 25 barrels of oil of a certain gravity under stated conditions, "then and in such event the production of oil from said first well meets the foregoing requirements, then Second Parties shall, within 30 days from the completion of such test", commence drilling another well and that successive wells should be drilled, provided the last met all said requirements. It provided that all taxes assessed against the minerals, other than the land owners' one-eighth royalty, should be paid by the respective parties on their proportionate interest. The development contract then contained the following provision which, considered with the first paragraph quoted therefrom and the royalty exception in the assignment, are very material on the chief question presented.

"If at any time any well on said land will not by its natural flow produce its allowable, Second Parties shall run a test for a 30-day period and if at the end of said test said well has so failed to produce its allowable by its natural flow, then and in such event the $\frac{7}{16}$ths over-riding royalty from any such well shall be reduced and there shall only be payable to the First Party hereunder a $\frac{7}{32}$nds over-riding royalty; provided, however, should any well on said lands produce less than 30 barrels per day for 30 consecutive days, then and in such event the overriding royalty payable from any such well or wells shall be reduced to $\frac{7}{64}$ths over-riding royalty."

It is undisputed and the Stroubes testified, in effect, that the requirement of a 30 day test before there was a reduction of McLachlans' $\frac{7}{16}$ths royalty was written into the assignment and development contract because the producing capacity of a well fluctuates from day to day and they wanted to avoid the necessity of frequently changing the percent of McLachlans' overriding royalty and such requirement was written therein so that the McLachlans might know they were being treated fairly and know when their overriding royalty should be reduced. For said reasons it was agreed that no reduction would be made in McLachlans' $\frac{7}{16}$ths overriding royalty until a 30 day test showed that a provision for reduction was then applicable. Mr. H. R. Stroube testified:

"Then, they (the McLachlans) were talking about 'How will we know that we are being treated fair and how do we know when to reduce these wells.' Well, I think I coined that phrase, too —what would you think about a 30-day test, because I had in mind that when a well got down to just making its allowable one day and a barrel or two under the next day, just rocking backwards and forth right on the line. We didn't want to be in a position of cutting—trying to cut the overriding royalty and have it come back the next day; so, I am pretty sure that I suggested 'What do you think about a 30-day test?' And, they said 'We think that is all right.' "

One of the Stroubes' counsel, who was present when the trade was being made, testified that a lawyer told McLachlans' representative that a provision for a 30 day test before reduction of the reserved royalty would give the McLachlans protection and that Mr. Stroube said, " * * * 'that was all right' * * * and, that was worked out in the deal, about this 30 day test." But, regardless of such admissions by the Stroubes, such was the effect of their contracts. The assignment and the development contract plainly require a 30 day test showing certain prescribed situations before there can be a reduction of the McLachlans' reserved $\frac{7}{16}$ths percent. After water flood became effective there could be no test of the natural flow of any well

to determine those matters. The McLachlans never agreed thereafter to a change of the percent of the oil, whether allocated or otherwise, that they had excepted from their grant in the absence of the prescribed test evidencing the matters required by the assignment. The assignment and development contract provide that the McLachlans are retaining a 7/16ths unless and until a test is made which reveals certain conditions. They provided for a reduction if and when a test shows certain things. They state that "then" the percent retained shall be reduced and there shall "then" only be retained a certain amount and that "then in such event" there shall be a reduction of the retained percent of the oil.

By the end of 1951, the Stroubes had completed, as producers, sixteen oil wells on the Eiland lease. Thereafter the Stroubes and other owners of working interests operating leases in that area became interested in creating a unit for secondary recovery operations. In October, 1954, the Stroubes committed their interest in the Eiland lease to the unit operation. The unit became effective May 1, 1955, with Warren Petroleum Corporation as the unit operator. Water flooding commenced soon thereafter. At that time 13 or 14 wells on Tract 5, depending upon whether well number 8 should be included in this group, were producing their allowable by natural flow and the other two were being pumped. Before the water flooding affected oil pressure, well 8 was tested for the prescribed period. The test proved that it was not capable of producing its allowable of 100 barrels a day for 30 days.

Under the unit water flood program the amount of oil actually produced from each tract is disregarded and each tract is allocated a percent of the total amount produced from the unit. The unit operating agreement, which became effective May 1, 1955, under which the Eiland lease, known as Tract 5, was committed to the unit operation by the Stroubes, provides the formula for such allocation as follows:

" 'Participation Formula' is the formula used for determining the Tract Value, and the factors in such formula are weighted as follows:

"a. Fifty percent (50%) on the proportion, expressed in percentage, that the gross acre feet of Canyon Reef Formation above the water table underlying each Numbered Tract within the Participating Area bears to the gross acre feet of Canyon Reef Formation above the water table underlying the Participating Area as a whole; and

"b. Fifty percent (50%) on the proportion, expressed in percentage, that the number of wells currently producing from Canyon Reef Formation located on each Numbered Tract within the Participating Area bears to the total number of wells currently producing from the Canyon Reef Formation and located in the Participating Area as a whole."

"All Unitized Substances produced from the Participating Area shall be allocated to the Numbered Tracts in the Participating Area, in accordance with the Tract Values designated on "Exhibit B" as allocable thereto, and such allocated production shall be deemed to have been produced from, and to constitute the total production of, such separate tract in lieu of the actual production therefrom."

Tract 5 was a favored tract among those making up the unit. Exhibit B, attached to and made a part of said agreement, shows the gross acre feet allocated to Tract 5, the number of oil wells thereon and that tract's proportionate value as follows: "Gross acre feet—74,480.02 No. of Wells— 15.4138 Tract Value—5.53023." Exhibit C shows the Stroubes percentage of participation in the oil produced by the unit as 5.53023. Paragraph 3 of Exhibit E is as follows:

"3. Allocation of Production

"Unitized Substances shall be allocated to the separate numbered tracts in the Participating Area on the percentage basis set forth in 'Exhibit B' to the Agreement or as 'Exhibit B' may be amended under the terms of the Agreement. It shall be considered that the production so allocated is actually produced from and constitutes the entire production of the tract to which it is allocated, and royalties, overriding royalties and oil payments, and the ownership thereof, as between Royalty Owners under such tract, shall be computed on such allocated production."

In the latter part of 1953, or early part of 1954, the McLachlans were given a copy of the unitization agreement and studied it with their engineer. The Stroubes committed their interest in the Eiland lease to the unit on October 15, 1954. According to the testimony of Mr. Heinselmann, who represented the McLachlans, the McLachlans were in favor of the secondary recovery operation from the beginning. But, they refused to commit their interest to the unit because the Stroubes claimed that when they did their 7/16ths overriding royalty would be thereupon reduced to 7/32nds. The McLachlans contended that if their interest were committed they would be entitled to share in the oil allocated to Tract 5 on the basis of 7/16ths of the oil then being produced by 14 wells and 7/32nds of that then being produced by two wells. Thirteen or fourteen wells were then producing their allowables by natural flow and two were being pumped.

In January, 1955, the Commission held a hearing on the application of the operators of that area for approval of the Sharon Ridge Canyon Unit and a permit for water injection operations. The plan for operation of the unit provided for peripheral water flooding and conversion of more than 30 oil wells into water injection wells. The McLachlans were not willing to have any of the oil wells in which they owned an interest, being all 16 on Tract 5, killed and used for the injection of water, because no request was made at said hearing for water injection wells on the Eiland tract, the McLachlans only requested an opportunity to protest any further location of water injection wells on Tract 5, which was granted.

The unit operating agreement provides for pressure maintenance by injection of gas, water and other substances. It provides that all oil produced from the unit shall be allocated to the included tracts in accord with each tract's value and that such "allocated production shall be deemed to have been produced from, and to constitute the total production of, such separate tracts in lieu of the actual production therefrom." It provides that the agreement for the unit shall become effective sixty days after certain events, including the execution thereof by all the operators and, at least, seventy-five percent of the royalty owners. It contains the following provision:

"Each Operator shall use its best efforts to secure at its own expense the execution of a Consent to this Agreement by all Royalty Owners having an interest under the leases contributed by such Operator, all in the form of Consent attached hereto as 'Exhibit E' or with such changes as may be approved by Operators. Whenever an Operator's effort to secure such Consent from a Royalty Owner shall have been unsuccessful, Operators shall have the right to select and direct a representative to make further attempt to secure such Consent at the expense of all Operators."

In May, 1956, Warren Petroleum Corporation, the unit operator, applied to the Commission for authority to convert oil wells 1, 3 and 9 on Tract 5 to water injection wells. The McLachlans vigorously contested the application. While that application was pending, the McLachlans, in August, 1956, filed this suit. In October,

1956, the Commission authorized the conversion of said wells. Said order recited that it appeared from the protest of the McLachlans that they had a controversy with the Stroubes over which the Commission had no jurisdiction and the Commission found that it should not defer action, as requested by the McLachlans, pending settlement of such controversy "that being considered by the Commission to be a private legal matter." The McLachlans exhausted their administrative remedies and brought suit in the District Court of Travis County to set aside that order. They obtained a temporary injunction restraining the conversion of said oil wells to water injection wells. In December, 1956, judgment was rendered against the McLachlans and conversion of wells 1, 3 and 9 was authorized. Warren did not actually convert said wells until the spring of 1957. The McLachlans committed their interest to the unit effective January 1, 1957. Water had been injected into the formation of the unit continuously since June, 1955. For nineteen months water had been injected into the formation of said unit at the rate of about 1,000,000 barrels per month. As stated by the Stroubes, the "McLachlans decided to accept the inevitable."

The McLachlans executed, effective January 1, 1957, a ratification and joinder which was also signed by the Stroubes and Warren. It recites that the McLachlans reserved an overriding royalty interest in Tract 5 in their assignment to the Stroubes; that the McLachlans did not execute or ratify the unitization agreement and protested the conversion of wells 1, 3 and 9. It recites the filing of this suit by the McLachlans for, among other things, an interpretation of the assignment; that the Commission approved Warren's application to convert said wells and that the McLachlans brought suit in Travis County to prevent such conversion. It recites that in said suit Warren stipulated on behalf of itself, the Stroubes, and all other owners of working interests in said unit that

the McLachlans "can ratify and adopt the Unit Operating Agreement—and thereafter receive the benefits which will accrue to them—without prejudice to any of—(McLachlans') contentions as to the construction to be placed on the instrument of conveyance wherein their overriding royalty interest is reserved except only that plaintiffs will not then be permitted to contend: (i) that the Stroubes had no right, without plaintiffs' consent, to execute said Unit Operating Agreement; or (ii) that said order by authorizing such conversion is void." Said agreement recites that the McLachlans decided to take advantage of Warren's offer and execute the royalty owners consent agreement. It then states that:

"The act of the McLachlans in ratifying and adopting the Unitization Agreement and the manner and amount of payments made to them as a result of such ratification and adoption shall be without prejudice to any of the parties hereto relative to their contentions as to the construction to be placed on the assignment from the McLachlans to the Stroubes, dated December 27, 1949, and shall likewise be without prejudice to the parties in cause No. 7020, styled Harry McLachlan, et al, v. H. R. Stroube, et al, pending in the District Court of Scurry County, Texas, as presently pleaded or as may hereafter be pleaded; provided, however, that the right of the Stroubes, without the consent of the McLachlans, to execute said Unitization Agreement in its inception, as specified in paragraph 2 above, and the right of Warren Petroleum Corporation, unit operator, to inject water in wells Nos. 1, 3 and 9 on said Tract 5 as specified in paragraph 3 above shall not be controverted."

At the same time the McLachlans executed the royalty owners' consent agreement effective January 1, 1957. It recites that "it shall be considered that the pro-

duction so allocated is actually produced from and constitutes the entire production of the tract to which it is allocated and—overriding royalties—shall be computed on such allocated production." It provides that its execution shall not be considered as a conveyance of overriding royalty but that its effect shall be limited to the purposes therein stated. It concludes that said agreement is subject to the agreement of December, 1956, between the Stroubes, Warren and the McLachlans, wherein it was expressly agreed that its execution was without prejudice to the McLachlans' construction of the assignment and their contentions in this case.

The McLachlans sought judgment that effective January 1, 1957, their royalty interest in the unit be fixed at $^{420}/_{1024}$ths of the oil allocated to Tract 5. They claim that their rights under the unitization agreement were fixed by the status of the wells on Tract 5 when the unit became effective. At that time there were 13 or 14 wells on Tract 5 on which payment of $^{7}/_{16}$ths overriding royalty was being made by the Stroubes to the McLachlans and two or three wells on which payment of a lesser percent was being made. Thirteen or fourteen wells were then producing their allowables by natural flow and two were being pumped. (The fraction of $^{420}/_{1024}$ths is the weighted average of 14 wells at $^{7}/_{16}$ths and two wells at $^{7}/_{32}$nds.) The McLachlans also sought the difference between the overriding royalty of $^{7}/_{32}$nds paid them on well number 8 from June 1, 1955, to January 1, 1957, and $^{7}/_{16}$ths, which they claim should have been paid them. For the present this contention will be disregarded. The McLachlans also sought recovery of engineering expenses. The facts found against the McLachlans settled that controversy and it is not here in issue. The Stroubes filed a cross-action praying for judgment that effective January 1, 1957, when the McLachlans joined the unit, the McLachlans were entitled to an overriding royalty of only $^{7}/_{32}$nds of the production allocated to Tract 5 until the monthly pro-

duction allocated to Tract 5 is less than 14,400 barrels and that when the monthly production allocated to Tract 5 is less than 14,400 barrels (16 wells x 30 barrels x 30 days) the McLachlans' overriding royalty should be reduced to $^{7}/_{64}$ths.

A jury found that (1) when the assignment was negotiated the parties intended that the provision reducing the McLachlans' overriding royalty from $^{7}/_{16}$ths to $^{7}/_{32}$nds "If at any time any well on said lands does not by its natural flow produce its oil allowable after a thirty-day test" should be applicable when Tract 5 was committed to a unit operation and water flood; (2) that the wells on Tract 5 presently flowing their allowables are not producing their allowables through "natural flow", as those words are used in the assignment; (3) that the parties intended "oil allowable" in the assignment to mean "calendar day" allowable; (4) that the McLachlans were forced by the Stroubes and Warren to commit their interest to the unit to protect their overriding royalty interest; (5) that after Tract 5 was committed to the unit it was impossible to apply the 30 day test prescribed by the assignment; (6) that when the McLachlans committed their interest to the unit they foresaw that said lease would be flooded out; (7) that, as a proximate result thereof, the McLachlans committed their interest to the unit. The court sustained the Stroubes' motion to disregard the answers to issues 3, 4, 5, 6 and 7 and entered judgment for the Stroubes on the answers to issues 1, 2, 8, 9, 10, 11 and 12, the contracts and the undisputed evidence. The answers to issues 8, 9, 10, 11 and 12 determined against the McLachlans their contention that they were entitled to recover engineering fees. Said answers are not here material. Judgment reducing the McLachlans' royalty must depend on the answers to issues 1 and 2, the instruments and the undisputed evidence. The effect of the judgment was to allow the McLachlans to recover from the Stroubes only $^{7}/_{32}$nds, instead of $^{7}/_{16}$ths as to 13 or 14 wells, of the production allo-

cated to Tract 5 until the gross monthly production allocated to Tract 5 is less than 14,400 barrels, when their royalty will be reduced to $\frac{7}{64}$ths thereof.

The McLachlans alleged that when the unit was created there were 14 wells flowing their oil allowables and two wells producing oil by pumping and that they sought to commit their interest to the unit on that basis; that the Stroubes then contended that if the McLachlans' interest were committed to the unit they should be paid, as their $\frac{7}{16}$ths overriding royalty reserved in the assignment, $\frac{7}{16}$ths of the oil that "would have been" produced through natural flow had there been no water flood and that when such amount was produced the McLachlans' royalty would be reduced to $\frac{7}{32}$nds of the proceeds of the oil allocated to Tract 5, regardless of whether the wells were flowing their allowables, and that the McLachlans should be paid, as their $\frac{7}{32}$nds overriding royalty reserved in the assignment, $\frac{7}{32}$nds of the proceeds of the oil that "would have been" produced between the time said wells "would have" ceased flowing their allowables had there been no secondary recovery operations and the time said wells "would have" produced less than 30 barrels of oil per day for 30 days had there been no water flood, whereupon, the McLachlans' royalty would be reduced to $\frac{7}{64}$ths; that the McLachlans declined to commit their interest to the unit on such terms; that, nevertheless, the Stroubes committed their interest to the unit prior to January 1, 1955. The McLachlans alleged that as a result of water flooding it is now impossible to apply the test prescribed by the assignment for determining when, if ever, their royalty should be reduced and that the Stroubes caused that situation. They then alleged:

"Consequently, plaintiffs' overriding royalty interest in Tract 5 must be determined by reference to the facts that existed when the Stroubes committed their leasehold estate in Tract 5 to the unit and unit operations com-menced. At that time there were fourteen wells on Tract 5 flowing their oil allowables and two wells on Tract 5 on the pump but capable of producing more than 30 barrels of oil per day for thirty consecutive days. Therefore, plaintiffs' overriding royalty in Tract 5 is equivalent to $\frac{420}{1024}$ths of the total amount of oil allocated to Tract 5 under the unit operation."

The Stroubes alleged the McLachlans did not commit their interest to the unitization agreement before its effective date, May 1, 1955, but the Stroubes committed their interest on October 15, 1954; that in joining the unit the Stroubes acted as prudent operators and that they were obligated by the lease to produce the largest possible royalties and that all royalty owners except the McLachlans had then signed said agreement. The Stroubes alleged that after the effective date of the unitization agreement, but before the McLachlans joined the unit, the McLachlans were paid on the basis of actual production from Tract 5, as distinguished from allocated production under the unitization agreement, and that this continued until January 1, 1957, when the McLachlans committed their interest to the unit. They alleged that, in order to complete the circle of water injection wells, the operator applied for and obtained authorization to convert oil wells 1, 3 and 9 to water injection wells; that the Commission provided that the allowable production from wells 1, 3 and 9 should not be transferred off Tract 5 until the McLachlans joined the unit and that the conversion of said wells did not take place until after the Travis County judgment had become final and the McLachlans had joined the unit. The Stroubes alleged that when the McLachlans joined the unit and executed the royalty owners' agreement the assignment was thereby amended and superseded so that the McLachlans' overriding royalty was thereby reduced to $\frac{7}{32}$nds of the production allocated to Tract 5 until the monthly production allocated to Tract 5

was less than 14,400 barrels, when same should be reduced to $\frac{7}{64}$ths thereof. The Stroubes denied that the McLachlans committed their interest to the unit on the basis of 14 flowing wells and 2 pumping wells, because, by executing said agreements, a "different method of payment, namely, allocated production", was agreed upon. Wherefore, the Stroubes prayed for a judgment so declaring. Such was the effect of the judgment rendered.

The McLachlans contend the court erred in so holding. The effect of some of their points is that the court erred in holding that by committing their interest to the unit and signing said agreements their royalty was reduced and, further, that the court erred in holding that after January 1, 1957, the McLachlans were entitled to receive only $\frac{7}{32}$nds of the oil allocated to Tract 5 and only $\frac{7}{64}$ths thereof when less than 14,400 barrels were allocated to said lease. The McLachlans' fourth and fifth points are as follows:

"(4) Since the instruments involved reserve to appellants a $\frac{7}{16}$ overriding royalty in the production from each well on the Eiland lease until such time as such well 'does not by its natural flow produce its oil allowable after a thirty-day test period'; and since under the unit operation, it is impossible to apply this test, the trial court erred in holding that appellants' overriding royalty interest in those wells in which appellant had a $\frac{7}{16}$ overriding royalty interest and to which it has become impossible to apply such test, has nevertheless been reduced from $\frac{7}{16}$ to $\frac{7}{32}$."

"(5) Since the instruments involved reserve to appellants a $\frac{7}{32}$ overriding royalty interest in the production from each well on the Eiland lease until such time as such well 'produces less than thirty (30) barrels per day for thirty (30) consecutive days'; and since under the unit operation, to which appellees committed the Eiland lease, it is impossible to apply this test, the trial court erred in holding that appellants' overriding royalty interest in the oil production from the Eiland lease is reduced from $\frac{7}{32}$ to $\frac{7}{64}$ during any month in which the amount of oil production allocated to the lease is less than 14,400 barrels."

We are forced to the conclusion that said agreements do not supersede the provision in the assignment fixing the percent of oil retained by the McLachlans. The Stroubes eventually return to the assignment as the instrument which fixes the percent of production the McLachlans are entitled to receive as their reserved royalty. The effect of the Stroubes' contention is that the assignment reserves $\frac{7}{16}$ths only so long as the wells produce their allowables by natural flow and, since the McLachlans have agreed to artificial production, their reserved interest is reduced. The production was artificial long before the McLachlans joined the unit and they were then paid $\frac{7}{16}$ths of the oil then produced by 13 wells that were flowing their allowables. It is evident from the instruments the McLachlans executed when they committed their interest to the unit that, relative to the amount of royalty, or percent of oil produced from or allocated to Tract 5, to which the McLachlans are entitled, the McLachlans agreed only that their royalty should be paid on the basis of the amount of production allocated to Tract 5, instead of the amount of oil actually produced from Tract 5. They simply agreed with the Stroubes that their royalty, whatever the percent, should be based upon allocated, rather than actual production. The royalty owners' consent provides that "It shall be considered that this production, so allocated, is actually production from and constitutes the entire production of the tract to which it is allocated and—overriding royalties—shall be computed on such allocated production." It provides that it shall never be construed as imposing upon any royalty owner the duty to pay any of the costs of the unit

operation nor as a transfer of royalty. There is nothing therein which changes the percent of the oil produced from, or allocated to, Tract 5 that shall be paid the McLachlans. There is nothing in any agreement executed by the McLachlans that purports to change the amount, or percent, of production reserved in the assignment, whether allocated or actual. In fact, the Stroubes' real contention seems to be that the unitization agreement resulted in an artificial, rather than natural flow, production and, therefore, under the terms of the assignment, the McLachlans' interest was automatically reduced from 7/16ths to 7/32nds. When these agreements were signed by the McLachlans this suit was pending. The McLachlans were then contending in this suit that their interest should remain at 7/16ths on every well until and unless a well was proved by a 30 day test to be incapable of producing its allowable through natural flow. The Stroubes were then alleging that the McLachlans were entitled to receive 7/16ths of the oil that "would have been" produced by natural flow had there been no water flood. With that situation existing, the McLachlans signed the agreements. They agreed to the unit operation and water flood and that their royalties should be paid upon the basis of allocated, instead of actual, production. The percent of oil produced to which the McLachlans were entitled, whether actual or allocated, was not changed. The McLachlans did not agree that their interest should be reduced to 7/32nds, nor that they would not rely on the assignment as fixing the percent of production from Tract 5 to which they were entitled. The Stroubes point out nothing in the agreements that has the effect of superseding the provisions of the assignment fixing the percent of oil reserved. The Stroubes say that because the McLachlans agreed to a "method of operation" which makes it impossible to apply the 30 day test, required by the assignment to reduce the reserved 7/16ths royalty, that the McLachlans have agreed that

it be reduced to 7/32nds. This certainly does not follow. The words in the asssignment fixing the amount of oil reserved make the thirty-day test a prerequisite to reduction. Both the assignment and the parol testimony show that the McLachlans reserved a 7/16ths of the oil produced from each well until it was established by a 30 day test that a well was incapable of producing its allowable by natural flow. When water flooding began 13 wells, at least, were producing their allowables by natural flow. There is no evidence that when the assignment was executed, wherein the circumstances required to reduce the McLachlans reserved interest were so clearly stated, that it was the intention to reduce that interest if the tract were flooded with water. True, water flooding is a "method of production" which prevents the making of such a test but that does not convey the reserved interest. The test was not changed, the percent of reserved oil was not reduced unless the McLachlans have agreed to change the percent of reserved production, or to a different test to determine same. Until January 1, 1957, when the McLachlans joined the unit, the Stroubes paid them 7/16ths of the oil produced from, at least, 13 wells. The number of producing wells on Tract 5 constituted fifty percent of the factors used to determine the percent of oil allocated to Tract 5. Although the Stroubes and others in the unit had for nineteen months before January, 1957, been forcing water into the formation of the unit, they paid the McLachlans 7/16ths of the oil produced from all wells that had not been proved incapable of producing their allowables but as soon as the McLachlans joined the unit the Stroubes said that percent of allocated production was automatically reduced, because the production was "artificial". It had been artificial for nineteen months during which they had paid 7/16ths of the oil produced from, at least, 13 wells to the McLachlans. When the royalty owners' consent and unitization agreement were signed, the McLachlans and the Stroubes

had notified each other, through their pleadings in this case, what their contentions were. The Stroubes knew that the McLachlans would thereafter insist upon, as to, at least, 13 wells, 7/16ths and, as to two or three wells, 7/32nds of the oil produced from, or allocated to, the Eiland lease. The Stroubes were then saying that the McLachlans were entitled to 7/16ths so long as the wells "would have" produced their allowable by natural flow had there been no water flooding. For nineteen months prior to the McLachlans' joining the unit, water had been injected under pressure into the oil formation and the test prescribed as a prerequisite to reduction of the McLachlans' royalty on, at least, 13 wells could not then have been made, yet they paid 7/16ths of the oil produced from 13 wells. In the assignment the McLachlans retained 7/16ths of the oil produced, regardless of how produced, unless and until certain events occurred. By executing the 1957 agreements they agreed with the Stroubes that oil allocated to Tract 5 should be considered as actually produced from the tract. It does not follow that the McLachlans thereby agreed to a reduction of the retained percentage of oil, whether actually produced or allotted. How could it be contended that by signing said agreements the McLachlans agreed to reduce the percentage of the proceeds of oil reserved by them. It was expressly provided therein that the act of the McLachlans in ratifying and adopting the unit agreement was without prejudice to their contentions as then, or thereafter, pleaded in this case. Under this situation, no court should say that the reservation in the assignment was amended and superseded so as to reduce the amount of oil reserved. As to this, the McLachlans and the Stroubes simply agreed that the percent fixed by the assignment was to be paid out of allocated instead of actual production. In the Eighth Annual Institute on Oil & Gas Law will be found the following applicable statements by eminent authorities:

"It is a fundamental provision in all unitization agreements that unit production be allocated to the separate tracts in the unit on the basis of the percentage participation of each tract. The portion thus allocated is delivered in kind to the working interest owner of such tract, who separately disposes of the same and who is separately liable for and who, out of such allocation, accounts for all royalties and other payments which he may be obligated to account for in accordance with the terms of the respective leases or other contracts covering such tract. Such payments are based on the amount of unitized substances allocated to the tract to the same extent as if produced from said tract." p. 260.

"These pre-existing contracts with reference to payment of royalty are modified only in the respect that they are to apply to allocated rather than actual production, unless otherwise specifically provided." p. 261.

At page 262 of the same volume in discussing the decisions in Arkansas Louisiana Gas Co. v. Southwest Natural Production Co., 221 La. 608, 60 So.2d 9, the author said:

"The court held with the defendant, who contended that the effect of the order was to allocate to each tract its pro rata share of the unit production and that the royalty owners in the unit were entitled to be paid as specifically provided in their pre-existing contracts out of the proceeds of the sale of the production so allocated to the tracts in which they had an interest."

The author, at page 290 says:

"It has been stated that the pre-existing oil and gas leases, including their expressed and implied covenants, remain in full force and effect after their inclusion in a unit, except in the

particulars that they are modified by the terms of the unit agreements."

He also calls attention, at pages 277, 278, of the same volume, to Phillips Petroleum Co. v. Peterson, 10 Cir., 218 F.2d 926, wherein the court cited Hoffman on Voluntary Pooling and Unitization and said:

"By such an allocation method of participation in unit production the parties clearly demonstrate their intention that the royalty and working interest ownership within each tract immediately prior to the unitization shall continue in effect, since the static ownership within the respective tracts comprising the unit is the basis upon which the allocation method of participation functions."

In Tarver v. Bracken, Tex.Civ.App., 134 S.W.2d 808 (Writ Ref.), under an assignment reserving a ¼th overriding royalty until production should "decline" to 250 barrels per day, when it should be reduced to ⅛th, it was held that reduction was not not to be determined by actual production limited by order of the Commission, but by a "natural decline" in production to less than 250 barrels per day determined by the test provided for in the assignment. In Midas Oil Co. v. Whitaker, Tex.Civ. App., 123 S.W.2d 495, an assignment provided for a reduction of the reserved overriding royalty in the event any well quit flowing oil and produced less than 150 barrels per day, to be determined by a ten-day pumping test. We held that cessation of such flow and making the ten day test were both prerequisites to reduction. In Exum v. Laub, 5 Cir., 87 F.2d 73, 74, the assignor retained ¼th of the oil produced by natural flow and ³⁄₁₆ths of that produced by artificial power, with the provision that if total production should decline below 200 barrels per day the interest reserved should be reduced to ⅛th. The lease had a producing capacity of more than 200 barrels per day, but a decline to less than 200 barrels was caused by an order of the Commission. It was held a "decline inherent in the wells" was intended and that the assignor was entitled to the full royalty until the wells declined below 200 barrels naturally and that such a decline caused by an order of the Commission did not have the effect to reduce the percent retained.

We shall now consider the McLachlans' eighth point in which they complain of a refusal of a judgment for $18,082.92 for their part of the oil produced by well number 8. They were paid ⁷⁄₃₂nds of the proceeds of its production but claim ⁷⁄₁₆ths. Prior to June 1, 1955, the McLachlans were paid ⁷⁄₁₆ths of the proceeds of the oil produced from well number 8. From June 1, 1955, to January 1, 1957, only ⁷⁄₃₂nds thereof was paid to the McLachlans. The assignment provides that if a well does not by natural flow produce its "oil allowable", as shown by a thirty-day test, then the overriding royalty shall be reduced to ⁷⁄₃₂nds. The test was made. During said time well 8 was capable of producing its "calendar day" allowable, but incapable of producing its "schedule" allowable. The question presented is which was meant by the use of the term in the assignment. We hold that schedule allowable was meant, as a matter of law. The jury found that when the assignment was negotiated the parties intended "calendar day" instead of "schedule" allowable. This finding was properly disregarded. Of course, the agreement was made in contemplation of the authority of the commission to fix the allowable and restrict the number of producing days. It is admitted that well 8 could not, as proved by a thirty-day test, produce 100 barrels of oil per day for a month, being the schedule allowable for that well. In contemplation of law well 8 produced only for the number of days per month permitted by order of the Commission. The amount of royalty was properly determined by the production permitted by the Commission. That part of the judgment is affirmed. Butler v. Jenkins Oil Corp., 128 Tex. 355, 97 S.W.2d 466, 467; Kingwood Oil Co. v.

Loehr, 5 Cir., 200 F.2d 551, 552. See also Haby v. Stanolind Oil & Gas Co., 5 Cir., 228 F.2d 298.

That part of the judgment denying the McLachlans a recovery of engineering expenses and an additional $\frac{7}{32}$nds of the oil produced from well number 8 from June 1, 1955, to January 1, 1957, is affirmed. Before production was affected by water flooding, it was agreed that the McLachlans' royalty on well 9 should be reduced to $\frac{7}{64}$ths and that on well 16 to $\frac{7}{32}$nds. We have held that the McLachlans' royalty on well 8 should be $\frac{7}{32}$nds. We hold that the McLachlans are entitled to $\frac{7}{64}$ths of oil allocable to well 9; $\frac{7}{32}$nds of that allocable to wells 8 and 16 and $\frac{7}{16}$ths of that allocable to the other 13 wells. The judgment is affirmed in part and in part reversed with directions to render judgment accordingly.