Gerald C. PUCKETT et al., Appellants,

v.

FIRST CITY NATIONAL BANK OF MIDLAND, Trustee et al., Appellees.

No. 11-85-024-CV.

Court of Appeals of Texas, Eastland.

Nov. 14, 1985.

Rehearings Denied Jan. 9 and Feb. 6, 1986.

Susan Richardson and Julia E. Vaughan, Cotton, Bledsoe, Tighe & Dawson, Midland, James T. Jeffus, Gulf Oil Corp., Houston, William R. Simcock, Walter J. Batla and Mary L. Brennan, Cox & Smith Inc., San Antonio, for appellants.

William B. Browder, Jr., Stubbeman, McRae, Sealy, Laughlin & Browder, Tom C. McCall and Randall Lundy, Lynch, Chappell, Allday & Alsup, Midland, Andrew L. Kerr, Green & McReynolds, San Antonio, for appellees.

## Opinion

McCLOUD, Chief Justice.

The principal issue in this oil and gas case is which method of calculating royal-

ties should be used in a "split stream" sale of gas produced from a voluntarily pooled unit. A split stream sale results when, as in the instant case, there is more than one owner of the working interest, and the individual working interest owners sell the gas allocated to them to different gas purchasers at different prices. Two methods of calculating royalties appear to have evolved: (1) the "weighted average" method whereby the royalty owners are paid on the basis of the sale of all gas produced and sold from the unit by all working interest owners; and (2) the "tract allocation" method whereby royalty owners are paid on the basis of the amount received by their individual lessee from the sale by their lessee of the proportion of gas from the unit allocated to the tract in which the royalty owner owns an interest.

This suit arose from disputes over gas produced from two gas units known as the Fort Stockton Gas Unit No. 3 (FSGU–3) and the Fort Stockton Gas Unit No. 6 (FSGU–6). Midland National Bank, now known as First City National Bank of Midland, acquired an oil and gas lease on certain lands owned by the Pucketts.[1] In 1968, pursuant to the lease, the Bank pooled 130.57 acres of the leased land with other acreage held by the Bank, Gulf Oil Corporation and other leasehold owners to form FSGU–3. The Bank pooled an additional 62.84 acres with other acreage held by the Bank, Gulf and other leasehold owners in 1969. This unit is known as FSGU–6. The Bank has sold its share of the gas produced from the units to Northern Natural Gas Company and LoVaca Gathering Company. Gulf has sold its share of the gas produced to LoVaca Gathering Company.

In 1978, Gulf sued LoVaca and the Bank alleging that LoVaca erroneously paid the Bank for gas that should have been credited to Gulf. The Bank filed a third party action against the Pucketts, the royalty owners, seeking reimbursement for royalties mistakenly paid the Pucketts. The Pucketts counterclaimed against Gulf and the Bank alleging that their 3/16 royalty interest was underpaid. The Bank sought indemnity and, alternatively, contribution from Gulf. The Bank also filed a third party action against Northern seeking indemnity, and Gulf cross-claimed against the Bank seeking indemnity. Before trial, LoVaca settled all claims and was no longer a party to the lawsuit, and Gulf had been fully reimbursed by LoVaca and the Bank on the original claim.

In a nonjury trial, the trial court held that the Bank, the Pucketts' lessee, properly applied the "tract allocation" method in calculating the royalties paid to the Pucketts by the Bank. The trial court held that the Pucketts were entitled to a 3/16 royalty on the proceeds from the gas "allocated" to the Bank on an acreage basis. The trial court found that the Bank was entitled to recover from the Pucketts royalties mistakenly overpaid in the amount of $409,110.63. The trial court, however, found that the Bank had underpaid the Pucketts' royalties in the amount of $67,823.94 on a 5.5904 percent interest in FSGU–3 transferred by the Bank to Gulf. The Bank was awarded contribution from Gulf for $45,493.24 of this underpayment. The Pucketts were credited with the $67,823.94 underpayment and $329,592.62 in royalties due the Pucketts but withheld by the Bank pending the conclusion of the controversy. The trial court's judgment ordered the Pucketts to pay the Bank the remaining $11,694.07 in excess royalties. The Bank recovered nothing against Northern for indemnity. The Pucketts' claims for additional royalties based on the weighted average method and for attorney's fees were denied. The Pucketts and Gulf appeal.[2]

*Royalty Calculation*

Under their lease, the Pucketts receive a 3/16 royalty from the production of three

---

1. The parties herein referred to as the "Pucketts" are: Gerald C. Puckett, Glenna Puckett Robbins and the Pecos County State Bank, Co-Trustees under the will of M.C. Puckett, Deceased, and Thelma Puckett.

2. Northern Natural Gas Company appears as an appellee since the trial court found that it was not liable for indemnity.

wells: FSGU Well 3–1 and FSGU Well 3–2 on FSGU–3 and FSGU Well 6–1 on FSGU–6. FSGU Well 3–1 and FSGU Well 6–1 were completed in 1969. Originally, the Bank authorized Gulf to sell its share of production. Gulf sold the gas to LoVaca at intrastate prices. Starting on September 1, 1971, the production from FSGU Well 3–1 and FSGU Well 6–1 was sold in a split stream arrangement: the Bank sold its share of production to Northern at interstate prices, while Gulf continued to sell its share of production to LoVaca. When FSGU Well 3–1 was plugged back to the Fusselman formation and recompleted in 1975, the Bank arranged to sell its share of production from the well to LoVaca. The Bank has continued to sell its share of production from FSGU Well 6–1 to Northern. FSGU Well 3–2 was completed in 1974. The Bank has continually sold its share of production from this well to Northern. From August 1973 to the date of trial, the intrastate prices paid by LoVaca exceeded the interstate prices paid by Northern. This led to the Pucketts' claim that their royalties had been underpaid.

The Pucketts first argue that the oil and gas lease and the division orders provide that their royalties should be based upon proceeds received from the sale of "all" gas from the two units involved by all working interest owners. To the extent that Gulf sold gas from the unit, the Pucketts seek to hold Gulf jointly and severally liable.

The Pucketts urge that the tract allocation method, used by the working interest owners and approved by the trial court, is inconsistent with the terms of the lease and the division orders. We disagree.

The oil and gas lease between the Pucketts and the Bank provides in part:

5. Lessee is hereby granted the right to pool or unitize this lease, the land covered by it or any part thereof with any other land, lease, leases, mineral estates or parts thereof for the production of oil, gas or any other minerals.... The entire acreage pooled into a unit shall be treated for all purposes, except the payment of royalties on production from the pooled unit, as if it were included in this lease. *In lieu of the royalties herein provided, lessor shall receive on production from a unit so pooled only such portion of the royalty stipulated herein as the amount of his acreage placed in the unit or his royalty interest therein on an acreage basis bears to the total acreage so pooled in the particular unit involved.* (Emphasis added)

The royalty clause of the lease provides for payment by the lessee to the Pucketts of "the market value at the mouth of the well of ³/₁₆ of the gas so sold or used." The two division orders each state, in part:

Until further written notice, you are hereby authorized to account to each of the undersigned for his interest in said gas in accordance with the division of interest which is correctly set out herein, subject to the terms and conditions hereinafter set forth:

1. Settlement hereunder shall be made on the basis of the proceeds derived from sales of such production and upon the volume computations made by the purchaser(s) thereof.

The operating agreements, signed by the working interest owners, provide in part:

9. *Marketing production*

Each party hereto shall have the right to take in kind or separately dispose of *its proportionate share* of the production from the Unit Area, exclusive of production used in development and producing operations and in preparing and treating oil for marketing purposes and production unavoidably lost. Upon any sale each party shall execute the division order or sales contract applicable to its own interest and shall receive the proceeds of the sale directly from the purchaser thereof. In event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the production, Operator shall have the right for the time being, subject to revocation at will by the party owning the same, to pur-

chase such production or to sell the same to others at not less than the market price.... (Emphasis added)

The unit designations for FSGU-3 and FSGU-6 expressly provide for the allocation of production to each tract forming a part of the units stating:

> The parties further agree that production of gas ... from any portion of the hereinafter described unit shall be *allocated* between the tracts comprising such unit on the acreage basis hereinafter set forth, and that each of their interests in such production shall be paid on the basis of such allocation. (Emphasis added)

In their division orders with the Bank, the Pucketts ratified, confirmed and adopted the establishment of the units. The division orders state in part:

> 7. The production which is the subject of this division order is obtained from a unit, and the establishment of such unit is hereby ratified, confirmed and adopted.

The Pucketts specifically ratified and adopted the establishmet of the units. See *Exxon Corporation v. Middleton*, 613 S.W.2d 240 (Tex.1981).

The oil and gas lease provides that the Pucketts are to be paid royalties by the Bank (their lessee) for the sale of gas marketed by the Bank. We find nothing in the pooling clause that expands the Pucketts' rights or imposes on the Bank any greater obligation regarding the marketing of the gas. The pooling clause specifies that the "lessor shall receive on *production* from a unit so pooled" its proportionate royalty. It does not say "on proceeds from the sale of all production" as urged by the Pucketts. The division orders signed by the Pucketts are addressed to the Bank. The division orders provide that "settlement ... shall be made on the basis of the proceeds derived from sales of such production." This obviously means the sale of production by the Bank. There is nothing in the

lease or division orders requiring Gulf or the Bank to pay the Pucketts' royalty based on the price that Gulf obtains for the benefit of its lessors for its allocated gas.

■ We disagree with the Pucketts' argument that the oil and gas lease and the division orders require that royalties be calculated on the basis of the proceeds received from the sale of "all gas" produced and sold from each unit. The Bank is the party obligated to market the gas once it is produced.[3] *Amoco Production Company v. First Baptist Church of Pyote*, 579 S.W.2d 280 (Tex.Civ.App.—El Paso 1979), *aff'd* 611 S.W.2d 610 (Tex.1980). Under the Pucketts' theory, the Pucketts would be bound by the efforts of Gulf and the other working interest owners in marketing their proportion of the gas produced, even though Gulf and the other working interest owners have no contractual obligations with the Pucketts. Likewise, under the Pucketts' theory, the lessors of Gulf would be bound by the efforts of the Bank in marketing the gas allocated to the Bank. We hold that the lease and division orders provide, as found by the trial court, that the Pucketts should receive a 3/16 royalty on the gas allocated on an acreage basis to their lessee.

The Pucketts urge us to follow *Shell Oil Company v. Corporation Commission*, 389 P.2d 951 (Okla.1963) (commonly referred to as the *Blanchard* case), a compulsory pooling case. There, the Oklahoma Supreme Court did adopt a "weighted average" method of calculating royalties. However, it is clear that the holding of the court was based upon a state statute, 52 Okla.Stat. sec. 87.1(d)(4) (1961), which provided:

> In the event a producing well, or wells, are completed upon a unit where there are, or may thereafter be, two (2) or more separately owned tracts, any royalty owner or group of royalty owners holding the royalty interest under a separately owned tract included in such spac-

---

**3.** The Pucketts stipulated that the gas sold by the Bank was sold at the maximum lawful interstate ceiling price and that they were paid market

value for their royalty interest by the Bank. See *Bowers v. Phillips Petroleum Co.*, 692 F.2d 1015 (5th Cir.1982).

ing unit *shall share in the one-eighth (⅛) of all production from the well or wells drilled within the unit....* (Emphasis added)

In holding that the statute specifically provided that royalty owners should receive a royalty interest on "all" production, the court stated:

Under paragraph 4, above, it is specifically provided that any royalty owner shall share in the ⅛th of all production from the well in the proportion that his acreage bears to the entire acreage of the unit.... While it is true that under their lease agreements with their lessees, Waldo Blanchard, O.S. Black and W.R. Blanchard have authorized their lessees, respectively, to dispose of the gas produced from their *separate tracts,* the statute supersedes their lease contracts and directs that each lessor will share in ⅛th of *all production from the unitized area.* (Emphasis in original opinion)

The *Blanchard* case is clearly distinguishable. The instant case is a voluntary, not compulsory, pooling case. More importantly, Texas has no statute similar to the Oklahoma statute.

Another landmark case in the area of "split stream" sales of gas is *Arkansas Louisiana Gas Co. v. Southwest Natural Production Co.,* 221 La. 608, 60 So.2d 9 (1952). There, the Supreme Court of Louisiana, when confronted with the question of the proper allocation of royalties, adopted the "tract allocation" method. That case, however, also involved the interpretation of statutes and a pooling order entered by the Commission of Conservation. We do note that the Texas involuntary pooling statute, Texas Mineral Interest Pooling Act, TEX.NAT.RES.CODE ANN. sec. 102.001 et seq. (Vernon 1978), is similar to the Louisiana statute and arguably adopts the tract allocation method in an involuntary pooled unit. Section 102.-051 states:

(a) For the purpose of determining the portions of production owned by the persons owning interests in the pooled unit, *the production shall be allocated to the respective tracts within the unit* in the proportion that the number of surface acres included within each tract bears to the number of surface acres included in the entire unit. (Emphasis added)

See Upchurch, "Split Stream Gas Sales and the Gas Storage and Balancing System," 24 ROCKY MT.MIN.L.INST. 665 at 673–675 (1978); 6 H. WILLIAMS & C. MEYERS, OIL AND GAS LAW sec. 951 at 702–706.2 (1984); and *McLachlan v. Stroube,* 324 S.W.2d 279 (Tex.Civ.App.—Eastland 1959, writ ref'd n.r.e.).

It is noteworthy to point out that in both the *Blanchard* case and *Arkansas Louisiana Gas Co. v. Southwest National Production Co.,* supra, the issue was whether or not the applicable statute changed the method of calculating royalties provided for in the respective oil and gas leases. While the lease terms were not discussed in either opinion, it is clear that each court felt, in the absence of some superseding statutory provision, that the royalties should be paid on the "portion allocated to the tract in which he has an interest." *Arkansas Louisiana Gas Co. v. Southwest National Production Co.,* supra, at p. 10.

Next, the Pucketts argue that the pooling of their acreage resulted in a cross conveyance between all royalty owners under *Veal v. Thomason,* 138 Tex. 341, 159 S.W.2d 472 (1942), and, therefore, each royalty owner should be paid royalties based on the weighted average method. We disagree. The court in *Veal* was concerned with necessary parties. The court did not address the question of how to calculate royalties in a split stream sale of production from a pooled unit. Moreover, the Pucketts' lease specifically states that the entire acreage pooled in a unit shall be treated for all purposes, "except the payment of royalties on production from the pooled unit," as if it were included in the lease. The language of the lease shows an express intent not to effect a cross conveyance as to payments of royalty.

The Pucketts also rely upon *TXO Production Corporation v. Prickette,* 653 S.W.2d 642 (Tex.App.—Waco 1983, no

writ), and assert that the court adopted the "weighted average" approach. *TXO* was a venue case. The issue was whether the lessor had established a cause of action. The court held that the lease, its pooling provision and the division order established a right to royalties, and when no royalties were paid, the royalty owner had a cause of action against the operator who was bound by the division order. The issue was not the calculation of royalties when the gas was being sold by two working interest owners at different prices to different gas purchasers. The division order provided that, "effective 1st sales," the operator would "give credit as set forth herein for all proceeds derived from the sale of gas." Also, there is no discussion in *TXO* of gas balancing which permits the working interest owners to equalize the production.

### The 5.5904 Percent Interest

On June 13, 1969, Edward H. Leede,[4] the Bank and Gulf, as working interest owners, executed an agreement amending the original operating agreements by reapportioning their interests in FSGU–3 and FSGU–6 as follows: Leede and the Bank gave a 5.5904 percent interest in FSGU–3 to Gulf in exchange for a 5.5904 percent interest in FSGU–6. The exchange agreement provided that Gulf would pay a $\frac{1}{8}$ royalty on the 5.5904 percent interest in FSGU–3 and that the Bank would pay the excess royalty. Since the Pucketts had a $\frac{3}{16}$ royalty in FSGU–3, Gulf was responsible under the agreement for a $\frac{1}{8}$ royalty or $\frac{2}{3}$ of the Pucketts' royalty, and the Bank was responsible for a $\frac{1}{16}$ royalty or $\frac{1}{3}$ of the Pucketts' royalty.

Until September 1971, Gulf sold the Bank's share of production from FSGU–3 to LoVaca at intrastate prices and paid the Bank its share of the proceeds plus the $\frac{1}{8}$ royalty on the 5.5904 percent interest. The Bank then paid the Pucketts the total $\frac{3}{16}$ royalty.

Effective September 1, 1971, Gulf began delivering the Bank's share of the gas produced from FSGU–3 and FSGU–6 in kind to the Bank. Gulf also delivered the $\frac{1}{8}$ royalty to the Bank in kind. The Bank sold all the gas it received to Northern at interstate prices and then paid the royalties from such sale to the Pucketts. Gulf continued to sell its remaining share of gas to LoVaca at intrastate prices.

The trial court found that the Pucketts' $\frac{3}{16}$ royalty in Gulf's 5.5904 percent exchanged interest in FSGU–3 had been incorrectly calculated and underpaid. The royalties paid were based on the lower interstate price that the Bank received from Northern. The trial court held that the royalties should have been based on the higher intrastate prices Gulf received from LoVaca. The trial court entered judgment that the Pucketts recover the additional royalties from the Bank and that the Bank recover from Gulf $45,493.24 for the $\frac{1}{8}$ royalty Gulf owed under the 1969 exchange agreement.

■ Gulf challenges the trial court's holding that the Bank is entitled to contribution from Gulf for the additional royalties owed to the Pucketts on Gulf's 5.5904 interest in FSGU–3 arguing, first, that the Bank did not allege the theory of contribution for additional royalties.

In its "second amended original answer, amended third party petition, and amended answer to counterclaim of Gerald C. Puckett, et al of the Midland National Bank, Trustee," the Bank prayed in part that "if the Pucketts recover any judgment against the Bank by reason or as a result of their claim to royalties from the proceeds received from the sale of all gas produced and sold from the Fort Stockton Gas Units Nos. 3 and 6, then the Bank have and recover judgment over and against Gulf for indemnity or in the alternative, contribution...." In Stipulation No. 37, all parties agreed that "the Bank has prayed for indemnity or contribution in the event the Pucketts recover anything from the Bank. The Bank has claimed against Gulf for indemnity and contribution." Gulf contends that the Bank's indemnity or contri-

---

4. Edward H. Leede's interest was later acquired by the Bank.

bution pleading was expressly applicable only in the event that the trial court held that the royalty should be calculated by the "weighted average" method and that the pleading did not refer to the 5.5904 percent "exchange gas."

During the trial, Gulf presented evidence establishing what the total 3/16 royalty would be based on the intrastate price that Gulf sold its share of production to LoVaca. Gulf also established its 1/8 royalty and the Bank's 1/16 royalty based on the same intrastate figures. In the final arguments to the trial court, Gulf argued on the merits of the Bank's claim for contribution should the Bank be held liable to the Pucketts for additional royalties on the 5.5904 percent interest in FSGU–3.

■ The theory of contribution was clearly before the trial court. If not properly alleged, which is unnecessary for us to decide, the issue was tried by implied consent. TEX.R.CIV.P. 67; *Ames v. Putz*, 495 S.W.2d 581 (Tex.Civ.App.—Eastland 1973, writ ref'd). This point of error is overruled.

■ Next, Gulf argues that by accepting the gas attributable to the 1/8 royalty interest in kind and selling it, the Bank has waived any right to receive proceeds from Gulf. Gulf further contends that the acceptance of the gas in kind estops the Bank from claiming contribution from Gulf for additional royalties. Gulf concludes that the judgment is erroneous as a matter of law in that the trial court failed to deny the claims of the Bank in light of Finding of Fact No. 20. Gulf concludes that Finding of Fact No. 20 is a "clear finding" that the Bank waived the right to contribution and is estopped to claim contribution. Finding of Fact No. 20 states:

Effective September 1, 1971, both Leede and the Bank commenced sale of their shares of FSGU No. 3 and FSGU No. 6 production to Northern Natural Gas Co. ("Northern"), and Gulf ceased selling their shares of gas to LoVoca. Trial Exhibit "11" is a copy of Leede's gas purchases contract with Northern, dated May 28, 1971. Exhibits "12–13" are cop-

ies of the Bank's contract with Northern, dated June 17–18, 1971. Exhibit A to the contracts shows that the Bank and Leede each committed their 8.7313% interests in FSGU No. 3 production *plus* the 1/8 of 5.5904% interest they had been receiving pursuant to their undertaking to pay the royalty due their lessors on the exchanged 5.5904% interest.

The trial court found in Finding of Fact No. 5 that Gulf had a contractual "obligation to account to the Bank for a 1/8 royalty due to the Pucketts."

The Bank argues that the acceptance of the 1/8 royalty in kind is neither a waiver nor an estoppel of its claim for contribution. Before September 1971, when as a matter of convenience the Bank accepted the proceeds for 1/8 royalty from Gulf and agreed to pay to the Pucketts their total royalty, the Bank did not relinquish its right to have Gulf bear the 1/8 royalty. The Bank argues that the delivery of the gas in kind beginning in September 1971, in lieu of proceeds from the sale of the gas by Gulf, is consistent with Gulf's contractual obligation to pay 1/8 royalty on Gulf's 5.5904 percent interest.

Gulf did not establish the necessary element of a promise by the Bank to release Gulf from its contractual obligation; therefore, estoppel has not been proved as a matter of law. *English v. Fischer*, 660 S.W.2d 521 (Tex.1983). Likewise, to support a claim of waiver, Gulf must have conclusively proven that the Bank either expressly or impliedly waived its rights to contribution or through an act amounting to estoppel impliedly waived its right to contribution. *Corrin v. Slagle*, 300 S.W.2d 657 (Tex.Civ.App.—Fort Worth 1957, writ ref'd n.r.e.). The Bank did not agree either by promise, expressed or implied, or by its actions to release Gulf from its obligation to pay the 1/8 royalty or to pay the difference between the value of a 1/8 royalty based on the higher purchase price Gulf received from LoVaca and the value of a 1/8 royalty based on the lower purchase price the Bank received from Northern.

Finding of Fact No. 20 does establish that the Bank and Leede agreed to sell to Northern all the gas received in kind from Gulf. Finding of Fact No. 20 does not establish that the Bank released Gulf from its obligation to pay ⅛ royalty. The cases cited by Gulf are distinguishable. The second and third points of error are overruled.

By cross-point, the Bank urges that the trial court erred in finding that the royalties were underpaid on the 5.5904 percent interest. Any complaint which the Bank might have had has been waived because the Bank did not timely except to the judgment, give notice of appeal, or in any way inform the trial court that they were dissatisfied with the judgment entered. *Comanche Land and Cattle Company, Inc. v. Adams*, 688 S.W.2d 914 (Tex.App.—Eastland 1985, no writ); *Western Construction Company v. Valero Transmission Company*, 655 S.W.2d 251 (Tex. App.—Corpus Christi 1983, no writ).

*Pucketts' Remaining Points of Error*

The Pucketts argue that the trial court erred in permitting Claude Upchurch to testify concerning legal opinions and conclusions. Assuming, without deciding, that Upchurch's testimony was inadmissible and that proper objections were made, the trial court is deemed to have disregarded any improperly admitted testimony in this non-jury trial. *Merrell v. Merrell*, 527 S.W.2d 250 (Tex.Civ.App.—Tyler 1975, writ ref'd n.r.e.). This point is overruled.

The Pucketts also contend that the trial court calculated the royalties based on "fictitious" proceeds, instead of actual proceeds, from the sales of production. We disagree. Accountants Caroline Rowey and Lois Matejek testified that the proceeds used to calculate the royalties were actual proceeds, not fictitious. The evidence supports the trial court's calculations.

The Pucketts assert that the trial court erred in not awarding them attorney's fees pursuant to TEX.REV.CIV. STAT.ANN. art. 2226 (Vernon Supp.1985).

The Pucketts prevailed on their counter-claim asserting underpayment of royalties on the 5.5904 percent interest in FSGU–3. Under Article 2226, attorney's fees are recoverable even if the amount of the claim is entirely offset by an opposing party's claim, as in this case. *McKinley v. Drozd*, 685 S.W.2d 7 (Tex.1985). The cases relied upon by the trial court were later expressly disapproved in *McKinley*. The claim for attorney's fees will be severed and remanded to the trial court for further consideration.

That portion of the judgment denying the Pucketts' attorney's fees is severed and reversed, and that cause is remanded. In all other respects, the judgment of the trial court is affirmed.

## ON GULF'S MOTION FOR REHEARING

In our original opinion, we held that Gulf failed to establish as a matter of law that the Bank "waived" its right to contribution or that the Bank was "estopped" from asserting its claim for contribution. We adhere to our original holding. We now additionally point out that Gulf waived the defensive theories of waiver and estoppel.

The trial court's findings established the Bank's cause of action against Gulf for contribution. None of the findings of fact or conclusions of law related to the defenses of waiver or estoppel. Gulf failed to request additional or amended findings of fact and conclusions of law relating to the defenses now urged. Therefore, Gulf waived these defensive theories. TEX.R. CIV.P. 299; *Pinnacle Homes, Inc. v. R.C.L. Offshore Engineering Co.*, 640 S.W.2d 629 (Tex.App.—Houston [14th Dist.] 1982, no writ); *Elliott v. Bowden*, 564 S.W.2d 825 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.); *Home Indemnity Company v. Muncy*, 449 S.W.2d 312 (Tex.Civ.App.—Tyler 1969, writ ref'd n.r.e.); *Pinson v. Dreymala*, 320 S.W.2d 152 (Tex.Civ.App.—Houston 1958, writ dism'd); 4 R. McDONALD, TEXAS CIVIL PRACTICE IN DISTRICT AND COUNTY COURTS sec. 16.09 (rev. 1984).

The issues urged by Gulf in its motion for rehearing, other than waiver and estoppel, were not asserted by points of error in Gulf's brief on appeal. These issues are not properly before us and cannot be considered. *Holmquest v. Priesmeyer*, 574 S.W.2d 173 (Tex.Civ.App.—Houston [1st Dist.] 1978, no writ); *W.T. Burton Company v. Keown Contracting Company*, 353 S.W.2d 909 (Tex.Civ.App.—Beaumont 1962, writ ref'd n.r.e.).

Gulf's motion for rehearing is overruled.