**AUSTRAL OIL COMPANY, INC., and Amoco Production Company, Petitioners,**

v.

**FEDERAL POWER COMMISSION, Respondent.**

Nos. 76–3647, 76–3852.

United States Court of Appeals, Fifth Circuit.

Oct. 14, 1977.

Rehearing Denied Nov. 14, 1977.

J. Evans Attwell, Judy M. Johnson, Houston, Tex., for petitioners.

---

Stephen J. Small, Charleston, W. Va., John M. Hill, Charleston, W. Va., for Columbia Gas Transmission Corp.

Allan Abbot Tuttle, Sol., Drexel D. Journey, Gen. Counsel, Joseph G. Stiles, Atty., Federal Power Commission, Washington, D. C., for respondent.

Before CLARK, RONEY and TJOFLAT, Circuit Judges.

CHARLES CLARK, Circuit Judge:

We review three unreported Federal Power Commission (Commission) orders [1] rejecting rate increase filings by Austral Oil Company and Amoco Production Company (petitioners) for the interstate sale of natural gas to Columbia Gas Transmission Corporation (Columbia). Finding the Commission's action to be a reasonable interpretation of its regulation implementing its "replacement contract policy," we affirm.

The Commission's replacement contract policy was adopted in Opinion No. 639 [2] for the express purpose of eliminating vintaging by contract date, a ratemaking technique which determined the permissible rate for producer gas by the date of execution of each contract for the production and sale of such gas. [3] The two-tiered rate structure classified as "old" and gave a lower price to all gas produced under contracts signed before a division date, and classified as "new" and gave a higher price to all gas produced under contracts signed after the division date. In Opinion No. 639 the Commission proposed to eliminate gradually this two-tiered rate structure by doing

away with "old" gas in increments. To do this, the Commission defined a replacement contract as one entered into to replace a prior "old" gas contract that had expired by its own terms and treated sales of gas under a replacement contract as sales of "new" gas for ratemaking purposes. The long-run goal of the Commission in eliminating price differentials based on vintaging by contract date was to increase production incentives by allowing a higher uniform base price for gas sold in interstate commerce which would more nearly equate to the cost of replacing the gas consumed. The replacement contract policy was one method chosen by the Commission to achieve this goal in an orderly manner with as little economic dislocation as possible. See generally *Shell Oil Co. v. F. P. C.*, 491 F.2d 82, 88–89 (5th Cir. 1974).

The Commission continued the replacement contract policy and elaborated on its scope in Opinion No. 699–H, [4] pointing out that it applied to renewal contracts only "after the expiration of the term of the previous contract and not before that date." 52 F.P.C. 1604, 1631–32 (1974), *citing Mobil Oil Corp. (Operator)*, 49 F.P.C. 239 (1973). In the same opinion the Commission promulgated a regulation embodying the replacement contract policy by allowing the rates for "new" gas to be applicable to

> [s]ales made pursuant to contracts executed prior to or subsequent to the expiration of the term of the prior contract where the sales were formerly made pursuant to permanent certificates of unlimited duration under such prior contracts which expired of their own terms on or after January 1, 1973, or pursuant to

1. The first two are letter orders dated April 30, 1976, rejecting rate increase filings by Austral Oil Company and Amoco Production Company; the third, dated August 3, 1976, is a joint order denying applications for rehearing filed by both companies.

2. Area Rates for the Appalachian and Illinois Basin Areas, 48 F.P.C. 1299 (1972), *on reh.* Opinion No. 639–A, 49 F.P.C. 361 (1973), *aff'd sub. nom. Shell Oil Co. v. F. P. C.*, 491 F.2d 82 (5th Cir. 1974).

3. The vintaging concept originated in the Commission's Statement of General Policy No. 61–1, 24 F.P.C. 818 (1960).

4. 52 F.P.C. 1604 (1974) (rehearing of Opinion No. 699, Just and Reasonable National Rates for Sale of Natural Gas from Wells commenced on or after January 1, 1973, and New Dedication of Natural Gas to Interstate Commerce on or after January 1, 1973, 51 F.P.C. 2212 (1974)), *aff'd sub. nom. Shell Oil Co. v. F. P. C.*, 520 F.2d 1061 (5th Cir. 1975).

contracts executed on or after January 1, 1973, where the prior contract expired by its own terms prior to January 1, 1973. 52 F.P.C. 1604 (1974), *codified at* 18 C.F.R. § 2.56a(a)(2)(iii) (1976) (current version at 18 C.F.R. § 2.56a(a)(5)(i) (1977)). Whether the contract between petitioners and Columbia had *expired of its own terms* within the meaning of this regulation is the gravamen of these proceedings.

On February 8, 1956, petitioners entered into a contract with a predecessor of Columbia for the sale of gas from the South Thornwell Field, Jefferson Davis and Cameron Parishes, Louisiana. The term provision of the contract, with which we are concerned here, was as follows:

TERM: This Agreement shall become effective upon the execution hereof, and shall continue and remain in force and effect from the November 1st following the date of first delivery hereunder for twenty (20) years and thereafter until the supplies of gas available to Buyer hereunder shall be so reduced that further operation of the pipe line in connection with this Agreement shall, in Buyer's judgment, be no longer profitable, whereupon by giving written notice of its election to Seller, Buyer may discontinue the purchase of gas from Seller hereunder, and this Agreement shall terminate.

The Commission issued petitioners permanent certificates of unlimited duration covering sales under this 1956 contract, and appropriate rate schedule filings were made.

By 1973 production under the 1956 contract had declined substantially due to normal depletion. In an attempt to offset this decline, petitioners in 1973 drilled an exploratory well on the leased lands to test for deeper gas-bearing structures. The results of this test were unsatisfactory, but the relatively low prices allowed petitioners under the 1956 contract and the Commis-

sion's vintaging policy made it economically impractical at that time to drill a second exploratory test well.[5]

Petitioners then sought to avail themselves of the Commission's replacement contract policy by beginning negotiations with Columbia to amend their 1956 contract so that it would expire by its amended terms after January 1, 1973. These negotiations resulted in an amendment, dated June 23, 1975, deleting the original term provision and substituting the following:

TERM: This Agreement shall become effective upon the execution hereof and shall continue and remain in force and effect until May 2, 1976.[6]

In consideration of the amendment petitioners agreed "to undertake additional drilling, recompletions and other activities in the contract area directed toward partially offsetting the declining deliverability of gas to Buyer." Petitioners filed the amendment with the Commission in accordance with the Commission's Rules and Regulations, and the Commission accepted the amendment by letter orders dated October 9, 1975. These letter orders contained standard language which cautioned petitioners that any future rate change pursuant to the amendment would be subject to the Commission's approval prior to the proposed effective date, and also that the order should not be construed as constituting approval of any rate. Thereafter, in accordance with their amendment agreement obligations, petitioners began to drill a new test well and undertook the required workovers and recompletions.[7]

On February 23 and 25, 1976, petitioners and Columbia executed replacement contracts for the sale of gas from South Thornwell Field from and after May 2, 1976. These contracts provided for a term of five years and thereafter until terminated on any anniversary date by the seller, and pro-

---

**5.** The test well that was drilled turned out to be very expensive because of the depth and high pressure encountered.

**6.** May 2, 1976, was twenty years after the date of initial deliveries under the original contract.

**7.** Petitioners assert that since June, 1975, they have spent approximately $3,400,000 on the new test well and $1,140,000 on the workover and recompletion operations.

vided for an increase in rates. On March 29 and 31, 1976, petitioners tendered these replacement contracts to the Commission for filing and simultaneously filed notices of rate increases up to the national rate for "new" gas established in Opinion Nos. 699 and 699–H, *supra.*[8] By separate but identical letter orders issued April 30, 1976, the Commission accepted the replacement contracts for filing but rejected the proposed rate increases on the ground that they were not permissible under the replacement contract policy since the original 1956 contract had not expired of its own terms on or after January 1, 1973. The Commission denied rehearing of these letter orders in an order dated August 3, 1976, stating that although the 1956 contract had expired of its own terms as a matter of contract law, it had not expired of its own terms within the meaning of the Commission's regulation pertaining to the price for sales of gas under replacement contracts.[9]

Timely petitions for review of the Commission's orders were filed by Austral in this court and by Amoco in the United States Court of Appeals for the District of Columbia Circuit. Amoco's petition was transferred to this court, where the proceedings were consolidated, and Columbia was granted intervention.

Petitioners attack the Commission's interpretation of its regulation in three ways: first, they argue that the interpretation is inconsistent with the language of the regulation itself; second, they argue that the interpretation as applied to them is inconsistent with the replacement contract policy; and third, they argue that the interpretation results in unlawful discrimination against them. In addition, petitioners indirectly and Columbia directly argue that the Commission should be estopped from denying their rate increases since the Commission, by accepting the 1975 amendments to the original contract, induced petitioners to incur substantial expenditures under the expectation that they would be able to recoup these expenditures through higher rates.

▮ The first of petitioners' arguments calls on us to determine whether the Commission's ruling that a prior contract "expire[s] of [its] own terms" only if it expires of its own original terms, and not the terms of a later amendment, is a reasonable interpretation of 18 C.F.R. § 2.56a(a)(2)(iii) (1976). This interpretation of the Commission's own regulations must be upheld unless the interpretation is unreasonable or inconsistent with the regulation. *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616, 625 (1965); *Shell Oil Co. v. F. P. C.,* 491 F.2d 82, 88 (5th Cir. 1974). Petitioners argue that the interpretation is inconsistent not only with the literal language and plain meaning of the regulation itself, but also with the replacement contract policy in general. This contention would require us to establish ideal scientific conditions under which the words of the regulation can be isolated and tested for their literal meaning. We reject such a sterile approach. Rather, the language of the regulation embodying the replacement contract policy must be interpreted in light of the purposes of the replacement contract policy itself. When the ramifications of petitioners' contentions are thus considered, it is apparent that the Commission's interpretation is neither unreasonable nor inconsistent with the language of the regulation.

The Commission's replacement contract policy is one method by which the Commission intended to eliminate the two-tiered rate structure for interstate sales of natural gas. The Commission recognized that setting higher prices would provide a greater incentive for the exploration and development of natural gas supplies for the interstate market. The Commission determined, however, to allow rates for "old" gas to increase gradually so that severe and harm-

---

**8.** These opinions set the national rate for "new" gas at 52 cents per Mcf in 1976; in contrast, the lower "old" gas rate allowed petitioners under their 1956 contract is 29.5 cents per Mcf.

**9.** 18 C.F.R. § 2.56a(a)(2)(iii) (1976).

ful economic dislocations, which would be caused by immediate, across-the-board rate increases, might be avoided. *See* Opinion No. 699–H, 52 F.P.C. 1604, 1638 n. 118 (1974). To accomplish its purpose of eliminating vintaging in an orderly manner over a period of time, the Commission chose an objective, mechanical formula to determine when "old" gas would be entitled to be treated as "new" gas for ratemaking purposes. Recognizing that "old" gas was being sold pursuant to contracts entered into at different times and extending for different terms, the Commission adopted a formula which tied price increases to the time that existing contracts expired of their own terms. Gas sold under a replacement contract would be entitled to the "new" gas national rates only after this time. In this way, the replacement contract policy envisioned bringing about a gradual phase-out of vintaging by original contract date.

In light of these goals, it is apparent that the Commission's holding the "new" gas rate applicable only after the prior contract has expired of its *original* terms is a reasonable interpretation of the regulation in question. Only by attaching eligibility for replacement contract treatment to the original terms of a prior contract can the mechanical approach toward eliminating vintaging adopted by the Commission be accomplished. If parties can execute an amendment to a prior contract to shorten the term and then achieve a higher rate under a replacement contract, as petitioners contend, the "new" gas rate will be extended to virtually all "old" gas in short order. Producers, such as Austral and Amoco in this case, naturally desire higher prices for gas that they sell. Pipelines, such as Columbia in this case, are perfectly willing to pay such higher prices: even the "new" gas rates are significantly below what the consuming market is willing to pay for this essential commodity in a time of short sup-

ply, so a pipeline company will have no problem passing its increased costs on to the ultimate consumer. The Commission, through its replacement contract policy, intended to give the producer of "old" gas a higher price, but in a time-phased manner calculated to minimize the economic dislocations to the consuming public from significantly increased rates. If the producers and their buyers, rather than the already fixed expiration dates in existing contracts, can control the timing of phasing in price escalations, the basic purpose of replacement contract pricing may be defeated. The timing of price changes would be determined not by the Commission's mechanical formula, but by the will of producers and buyers who have little or no incentive but to go to higher prices at once. The Commission's interpretation allowing the replacement contract policy to be applicable only upon the expiration of a prior contract by its original terms, and not by the terms as amended, is reasonable and necessary for the gradual elimination of vintaging in an orderly manner.[10]

Moreover, the Commission's holding in this case is not inconsistent with its position in previous cases. The decision in *Mobil Oil Corp. (Operator)*, 49 F.P.C. 239 (1973), gave fair warning that the Commission would not allow parties to alter the terms of a prior contract in order to come within the replacement contract policy. In that case the parties renegotiated rather than amended their prior contract in order to have it expire at an earlier date. The Commission held that when an existing contract is renegotiated prior to the termination of the contract, the termination date of the original contract and not the termination date of the voluntarily renegotiated contract is the critical factor for determining the proper vintage rate under the replacement contract policy. The principle of the *Mobil* case was reiterated in Opinion No. 699–H,

---

**10.** We are not unaware that the expectation of higher rates encouraged petitioners to engage in additional exploration and development activities in order to find new supplies for the interstate market, and that this achieved one goal of the replacement contract policy. Still,

another component of that policy is the orderly, gradual phasing out of vintaging to avoid sharp increases in rates. It is this second component that the Commission found to be the more important.

52 F.P.C. 1604, 1631–32 (1974). Though an amendment is a different form of altering contractual obligations than is a renegotiation, the substance is the same in the context of qualifying to come under the replacement contract policy, for the contracting parties rather than the Commission choose when prices rise. The Commission has applied its replacement contract policy consistently. Opinion Nos. 639, 639–A, the *Mobil* case, and Opinion No. 699–H all gave petitioners fair warning of the components of the policy.[11]

Petitioners' argument that this interpretation results in unlawful discrimination against them is not well taken. Petitioners urge that the term provision in their contract, drafted over twenty years ago at a time when neither "vintaging" nor "replacement contract policy" was even a gleam in the Commission's eye, will never allow them to become eligible for the national "new" gas rate. Petitioners argue that there is no substantive justification for the Commission to reject their rate increases while accepting hundreds of rate increases filed by other producers based upon the termination of fixed term contracts and the negotiation of replacement contracts. Though this argument should appeal to the Commission's power to grant special relief, the short answer to it for this court review is that the Commission has not acted unreasonably in distinguishing fixed term contracts from indefinite contracts for purposes of its replacement contract policy. The Commission noted that producers and pipelines who in 1956 entered into twenty-year contracts had expectations different from those of petitioners and Columbia in their contract. The Commission knew when it adopted the replacement contract policy that existing contracts had indefinite as well as fixed term provisions. It cannot be said that the Commission acted unreasonably when it chose to frame this policy in a way that gave an advantage to fixed term contracts. *See* The Second National Natural Gas Rate Cases, No. 76–2000, et al., at 87, n. 91 (D.C. Cir. June 16, 1977).

Finally, petitioners and Columbia argue that they relied on the Commission's acceptance of their amendment agreement by which they exchanged a new term provision for promises to drill a new test well and to undertake substantial workovers and recompletions. This amendment was accepted by the Commission on October 9, 1975, and petitioners argue that they relied on this acceptance order and expended vast sums of money under the assumption that they would be entitled to the "new" gas rate upon the expiration of their contract, as amended. This assumption, however, was not one that petitioners were entitled to make. An order accepting an amendment to a contract is not authorization for a rate increase in the absence of a specific request for a rate increase. *See Sunray Mid-Continental Oil Co. v. F. P. C.*, 290 F.2d 552, 555 (10th Cir. 1961); 18 C.F.R. § 154.-101 (1976). In addition, the letter order issued October 9, 1975, specifically stated that any subsequent rate change would have to be filed for the Commission's approval. Though petitioners may have contemplated rate increases as a quid pro quo for their new contractual obligations, they were not entitled to treat the Commission's acceptance of these amendments as tacit approval for future rate increases under the replacement contract policy.

AFFIRMED.

---

11. The Commission has continued the interpretation it applied here in subsequent proceedings. *See, e. g.,* Opinion No. 770, National Rates for Jurisdictional Sales of Natural Gas Dedicated to Interstate Commerce on or after January 1, 1973, for the Period January 1, 1975, to December 31, 1976 (F.P.C.1976), *reh. denied,* Opinion No. 770–A (F.P.C.1976); Skelly Oil Company, F.P.C. Gas Rate Schedule No. 228, Order on Remand (Feb. 14, 1977).