FIRST NATIONAL BANK IN WEATH-
ERFORD, TEXAS, Petitioner,

v.

EXXON CORPORATION et al.,
Respondents.

No. B–9483.

Supreme Court of Texas.

July 15, 1981.

Rehearing Denied Oct. 28, 1981.

Day, Day & McGee, Joe Day, Jr., Marshall Day and Bruce W. McGee, Fort Worth, Sanders, Sauders, Brian, Finney, Thomas & Smith, Ronald D. Nickum, Amarillo, for petitioner.

Baker & Botts, Frank G. Harmon and Stephen Hackerman, Morgan L. Copeland, Houston, for respondents.

1. See, e. g., Kingery v. Continental Oil Co., 626 F.2d 1261 (5th Cir. 1980). The Fifth Circuit reached the same result we here reach. We are told by counsel in our case that the Fifth Circuit is withholding its action upon the motion for rehearing in Kingery to await our decision in this case.

GREENHILL, Chief Justice.

This is a suit to recover allegedly deficient royalty payments. The question presented is whether gas sales in the intrastate market constitute comparable sales for the purpose of determining the value of gas dedicated to the interstate market. The trial court held that the two were not comparable, and a majority of the Court of Civil Appeals agreed. 597 S.W.2d 783. Considering, among other things, that several other cases are pending involving the same or related questions,[1] we granted the writ of error. We affirm.

The facts are undisputed. In 1960, the First National Bank in Weatherford, Texas, ("the Bank"), as surface owner and as agent for the State of Texas under the Relinquishment Act,[2] executed oil and gas leases on a section of land in Pecos County. The lessee of the northern half of the section was Gulf Oil Corporation ("Gulf"), and a predecessor of Exxon Corporation ("Exxon") was lessee of the southern half. Both leases were made on the standard lease form for Relinquishment Act lands provided by the State's General Land Office, and both made provision for the Bank to receive "$3/32$ of the value of all oil and gas produced and saved."

In 1964, the gas rights in the two leases were pooled, and Exxon obtained the entire working interest by a farm-out agreement with Gulf in the same year.

In 1965, a producing gas well was completed on the property. Exxon began paying shut-in royalties, as there were no pipeline connections available in the field. Under the terms of both leases, the payment of shut-in royalties was limited to five years. Then the leases would terminate.

Pursuant to its obligation to the royalty owners to market the gas, and mindful of the five-year deadline on shut-in royalty

2. Presently codified in 1 Texas Natural Resources Code title 2, sections 52.171–.185, being also Vernon's Texas Codes Annotated, Natural Resources section 52.171–.185.

payments, Exxon explored a number of possibilities for sale of the gas. However, as found by the trial court, at that time "the only possible purchasers capable of absorbing the volumes [of gas produced from the well] were interstate pipeline companies." In 1967, Exxon entered into a twenty-five year contract for sale of the gas to Northern Natural Gas Company ("Northern"), an interstate carrier.

The trial court found, "[t]he contract between Exxon and Northern Natural was a bona fide arm's length transaction. The resulting terms and conditions are the type which reasonable people would have agreed upon, including reasonable provisions as to the terms of the contract, the price, price escalation, and all other provisions of such contract." The Bank does not contest these findings. The trial court held that Exxon was prudent in entering into the contract. Since the gas was to enter interstate commerce, Federal Power Commission approval of the contract was sought and obtained in 1968.

Soon after deliveries of gas to Northern began, Exxon submitted a division order to the Bank providing that royalties would be based on proceeds under the Federal Power Commission's approved rate. The Bank executed the division order, and received royalty payments thereunder, without complaint, for over nine years. Twice during that time, Exxon renegotiated a higher price from Northern, including an amendment in 1975 which pegged the sales price at the highest price allowed by law for the gas. This same amendment also contained a pass-through clause which provided that Northern would reimburse Exxon for any royalty payments required to be based on a market value higher than the regulated ceiling price.

The Bank was given no notice of the decision to contract with Northern, or of the accompanying dedication of the gas to interstate commerce. Counsel for the Bank conceded at oral argument that the Bank had no right to take part in the marketing decisions concerning the gas, and no right to object to any sales contract subsequently entered by Exxon. Counsel further conceded that the Bank's lease did not contain an express or implied covenant not to sell the gas in the interstate market. Rather, the Bank's position is that, while Exxon was free to make whatever marketing decisions it desired, royalties still must be calculated on the basis of the best price obtainable in either the interstate or intrastate market.

In its brief, the Bank implies that for royalties to be based on the regulated price, the burden was on Exxon to negotiate a "proceeds" royalty clause in the leases rather than the "market value" clauses actually used. The required use of the State's standard lease form removed this issue from the parties' negotiations. Also, Exxon has agreed all along that the royalties must be based on market value, arguing only that federal regulation has placed a ceiling on market value, which in this case, happens to coincide with the proceeds from the contract.

The question then depends on how market value of the gas is to be determined. We answered this question in *Exxon Corporation v. Middleton*, 613 S.W.2d 240 (Tex. 1981):

> Market value may be calculated by using comparable sales. Comparable sales of gas are those comparable in time, quality, quantity, and availability of marketing outlets.
>
> . . . Sales comparable in quality . . . also involves the legal characteristics of the gas; that is, whether it is sold in a regulated or unregulated market, or in one particular category of a regulated market . . . . To be comparable, the sales must be made from an area with marketing outlets similar to the gas in question. Gas from fields with outlets to interstate markets only, for instance, would not be comparable to gas from a field with outlets only to the intrastate market.

613 S.W.2d at 247. While in *Middleton* we were not called upon to determine the market value of regulated gas, we were presented with the question whether regulated interstate sales prices had any bearing on determining the market value of unreg-

ulated intrastate gas. On that question, we stated, "[i]ntrastate and interstate gas prices are not comparable in quality. They are conceptually and legally different." *Id.* at 248. We adhere to those statements. We hold that intrastate sales of gas are not comparable to interstate sales regulated by the Federal Power Commission.

We regard the above point to be dispositive of this appeal. Other points have been considered and are overruled.

The judgments of the courts below are affirmed.