**Mary Gladys BOWERS, et al.,
Plaintiffs-Appellants,**

v.

**PHILLIPS PETROLEUM CO., et al.,
Defendants-Appellees.**

**No. 82–1014.**

United States Court of Appeals,
Fifth Circuit.

Dec. 6, 1982.

Ronald D. Nickum, Amarillo, Tex., for
plaintiffs-appellants.

Rain, Harrell, Emery, Young & Doke,
Michael V. Powell, Morris Harrell, Dallas,
Tex., Don Jemison, Phillips Petroleum Co.,
Legal Div., Bartlesville, Okl., for defend-
ants-appellees.

Dennis M. Dylewski, John L. Verner,
Houston, Tex., for Natural Gas Pipeline Co.
of America, amicus curiae.

Appeal from the United States District
Court for the Northern District of Texas.

Before GARZA, TATE and WILLIAMS,
Circuit Judges.

TATE, Circuit Judge:

In this Texas diversity suit, the plaintiffs
(Bowers), lessors of the mineral rights of
Texas oil and gas fields, seek additional
royalties under their leases with the defend-
ant, Phillips Petroleum Company (Phillips).
Bowers claims that Phillips did not pay
royalties based on the "market value" of
Phillips' subsequent sales of the gas from
the leased properties. Phillips had sold the
gas in interstate commerce at the maximum
prices permitted by federal regulation. Af-
ter trial without a jury, the district court,
526 F.Supp. 1320, held, and we affirm, that
under Texas law, Phillips paid proper royal-
ties, because the market value of gas pro-
duced that is subject to federal price regu-
lation cannot exceed its maximum federal
price ceiling.

*The Issue*

As will be stated more fully with appro-
priate citation below, the issue here in-
volves the market value of gas produced
under a mineral lease for purposes of calcu-
lating the royalties due to the landowner-
lessor, and it arises in the context of exten-
sive federal regulation fixing maximum
prices for gas produced in various classifica-
tions or categories.

In contending that the district court
erred, the plaintiffs Bowers—whose lessee
(the defendant Phillips) had in 1969 com-
mitted the gas production from wells on
Bowers' land for sale at certain prices for a
period of twenty years—contend that the
contract price received by Phillips (upon

which the royalties were based) is not the "market value". Bowers relies on Texas jurisprudence to the effect that the market value for royalty purposes is determined as of the time the gas is produced, not at the date of execution of the long-term contract for its disposition; and that the gas should be valued as though it were free and available for sale at the time of production, not bound by the terms of a long-term contract executed between the producer and a distributor, to which the landowner-lessor is not a party. For reasons set forth below, we find instead to be controlling Texas jurisprudence to the effect that market value is determined by, inter alia, the comparability of sales of regulated gas as fixed by the maximum prices allowable under federal regulation for the specific category into which the produced gas falls. The district court therefore correctly dismissed Bowers' suit for unpaid royalties, since Bowers received royalties based on the maximum price allowable for gas of its category—i.e., gas produced and sold under an existing contract for resale in interstate commerce.

## I. *The Facts*

The plaintiffs Bowers claim royalty interests under four oil, gas and mineral leases on lands in Hemphill County, Texas. The defendant Phillips, the lessee of these properties, agreed to pay the plaintiffs royalties based on the "market value" of the gas produced from the lands.[1]

On February 10, 1969, Phillips entered into a contract with the Natural Gas Pipeline Company of America (Natural), a company engaged in the interstate transportation and resale of natural gas, for the sale of gas produced from Phillips' leaseholds, including the lands covered by the leases at issue. This contract had a term of twenty years from the date of first delivery of gas

and has not at any time expired by its own terms. All the gas from Phillips' wells was sold in interstate commerce for resale, pursuant to Certificates of Public Convenience and Necessity issued by the Federal Power Commission (FPC) and its successor, the Federal Energy Regulatory Commission (FERC). The price of the gas sold under this contract was regulated by the FPC and the FERC, which imposed maximum lawful ceiling prices on gas committed to resale in interstate commerce. The disputed gas royalties concern gas produced from Phillips' wells on Bowers' lands during the period January 24, 1973, through and including December 31, 1980.

Under the lease terms, *see* note 1 *supra*, Phillips was obligated to base its royalty to the plaintiffs upon the market value at the well of the natural gas sold off-premises. Phillips determined "market value" and based royalty payments on the amounts it received for the gas under the long-term contract with Natural. Bowers received royalties from the defendant that were at least equal to one-eighth of the maximum lawful ceiling prices for the particular gas produced and sold from their lands.

Bowers sued to recover additional royalties, claiming that the Phillips-Natural contract price did not constitute "market value" of natural gas under the terms of the Bowers-Phillips leases. Bowers argues that Texas case law has established that "market value" is based on "comparable sales" in the interstate market of gas that is "free and available for sale." In Bowers' view, market value of currently produced gas is proved by evidence of contemporaneous sales of gas committed to interstate commerce, not measured by the actual proceeds from a long-term contract between Phillips and a third party. As an incident of federal regulation of the price of natural gas,

---

1. The gas royalty clause of each of the oil, gas and mineral leases states in part:

   The royalties to be paid by Lessee are: . . . (b) on gas, including casinghead gas or other gaseous substance, produced from said land and sold or used off the premises or in the manufacture of gasoline or other product therefrom, the market value at the well of

   one-eighth of the gas sold or used, provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale. . . .

   The plaintiffs originally entered into these leases with Gulf Oil Corporation (Gulf) in the years 1955 and 1956. The defendant Phillips acquired Gulf's interests in the four leases.

current sales in the interstate market may command higher prices than the maximum ceilings imposed on the gas sold under the Phillips-Natural contract executed in 1973. Bowers contends that it is these higher prices that represent the market value of regulated interstate gas.

Bowers presented evidence at trial of the higher regulated prices that its gas could command if Phillips presently replaced, or "rolled over," the existing sales contract with Natural and the new contract became subject to different categorization under federal law. Phillips presented no evidence of comparable sales. It contended, and the district court agreed that, as a matter of law, the market value of the gas produced from the wells at issue may not exceed the federally regulated price of that gas. Since Bowers actually received royalties based on this maximum price, the district court found that no excess royalties were due to these plaintiffs.

## II. What is "Market Value"?

In determining market value under these Texas leases, the familiar willing-buyer, willing-seller method of establishing comparative market prices is somewhat distorted by the federal price controls. Until 1978, the Federal Power Commission (FPC) regulated by orders the price of natural gas in interstate commerce.[2] The Natural Gas Policy Act of 1978, 15 U.S.C. §§ 3301, et seq., established the Federal Energy Regulatory Commission (FERC), which has authority to impose varying maximum price ceilings on both intrastate and interstate gas. The FERC categorizes the gas according to its physical characteristics, vintage from the geographic location and the date the well was dug, and when and what market it was committed to sale, and fixes varying maximum ceiling prices within the different categories for sale by the producer to distributors. The FPC (and now, the

FERC) lacks authority to regulate the amount of royalty paid by the lessee-producer to the lessor, see Mobil Oil Corporation v. Federal Power Commission, 463 F.2d 256 (D.C.Cir.), cert. denied, 406 U.S. 976, 92 S.Ct. 2409, 32 L.Ed.2d 676 (1971); however, since the plaintiffs' royalties are based on a percentage of the market value of the gas when sold, federal regulation of price implicitly affects the amount of royalties based upon the market value of the natural gas produced and sold by the lessee.

### A. Texas Jurisprudence

Texas law has sought to preserve the willing-buyer, willing-seller concept of market value by basing it on comparable sales of similar gas. The Texas Supreme Court holds that market value of gas is to be determined at the time the gas is produced rather than when the producer and distributor execute a long-term contract. It is "sold" for purposes of the royalty provision at the time of each delivery to the pipeline; the lessor is entitled to royalties based on the value of comparable, contemporaneous sales of gas and not merely the proceeds from the producer's sales contract. See Texas Oil & Gas Corporation v. Vela, 429 S.W.2d 866 (Tex.1968).

Similarly, in Exxon Corporation v. Middleton, 613 S.W.2d 240 (Tex.1981), the Texas Supreme Court considered the gas "sold" at the time of delivery, regardless of the fixed price to which it has been committed in a long-term contract, and found that gas "should be valued as though it is free and available for sale." 613 S.W.2d at 246 (emphasis supplied). The lessor may calculate the current market value of gas production by using evidence of comparable sales, defined as those sales "comparable in time, quality, quantity, and availability of marketing outlets." 613 S.W.2d at 246 (citing Vela).

2. In 1954, the Supreme Court held in *Phillips Petroleum Co. v. Wisconsin*, 347 U.S. 672, 676, 74 S.Ct. 794, 796, 98 L.Ed. 1035 (1954), that the Natural Gas Act of 1938, 15 U.S.C. §§ 717 *et seq.*, authorized the FPC to regulate the prices of natural gas for resale in interstate commerce. A two-tiered market then developed: a regulated interstate market and an unregulated intrastate market in which the gas generally commanded higher prices. *See generally* Wiese, Valuation of Gas For Royalty Purposes, 45 Tex.B.J. 1033, 1034 (1982).

The *Middleton* decision defined "comparability" of sales, however, to reflect the regulation of market prices of natural gas. "Comparability of quality" means not only similar physical properties, but also includes the "legal characteristics" of the gas: "whether it is sold in a regulated or unregulated market, *or in one particular category of a regulated market.*" *Id.* (emphasis supplied). In defining "comparable marketing outlets," the court pointed to both geographic location and legal markets, for "[g]as from fields with outlets to interstate markets only, for instance, would not be comparable to gas from a field with outlets only to the intrastate market." *Id.* at 247.

*Vela* and *Middleton* involved only sales of unregulated gas sold in the intrastate market. However, *Middleton's* holding that the market value of intrastate gas could not be determined by the non-comparable sales of regulated interstate gas—and its reference to comparability as including not only the legal characteristic of whether the gas is sold in a regulated or an unregulated market, but also whether "in one particular category of a regulated market"—at least implicitly support equally the rationales: (a), that the sales of unregulated, intrastate gas cannot be comparables upon which to fix the market value of gas dedicated to the regulated interstate market (as specifically held by the Texas court a few months later in *First National Bank in Weatherford v. Exxon Corporation*, 622 S.W.2d 80, 81–82 (Tex.1981)), and also (b), pertinently here, that the sales of gas in one regulated category are not comparables to be utilized in fixing the market value of natural gas sold in another regulated category.

The Fifth Circuit has also recognized that the determination of market value must consider the price regulation of the market in which the gas may legally be sold. In *Kingery v. Continental Oil Company*, 626 F.2d 1261, 1264 (5th Cir. 1980), *cert. denied sub nom. Brent v. Natural Gas Pipeline Co. of America*, 454 U.S. 1148, 102 S.Ct. 1012,

71 L.Ed.2d 302 (1982), which was rendered after the Texas appeals court, but before the Texas Supreme Court decided *Middleton*,[3] this court held that because sellers and buyers of gas in interstate commerce cannot lawfully contract for prices above federal ceilings, sales on the unregulated intrastate market are not comparable in calculating the market value of gas committed by producer contract to interstate commerce. 626 F.2d at 1264–65. This court reaffirmed that the test for market value is:

> [W]hat ... a willing seller and a willing buyer in a business which subjects them and the commodity to restriction and regulation, ... [would] agree to take and pay with a reasonable expectation that the FPC [now the FERC] would approve the price (and price changes) and other terms and then issue the necessary certificate of public convenience and necessity.

*Kingery*, 626 F.2d at 1264.

The plaintiffs Bowers point out that *Kingery* and *Weatherford* held only that sales of *un*regulated gas could not be regarded as comparables to determine the market value of regulated gas, and that *Middleton* held only that sales of *regulated* gas were not comparables for determination of the market value of unregulated gas; the decisions did not expressly hold that comparables of sales of regulated gas did not include all sales within the regulated market. Bowers further notes that these decisions did not disturb the basic holding of *Vela* that the market value for purposes of calculating royalties is not determined by the price fixed in the long-term contract between the producer and the distributor, but rather by the current market value of the gas produced, nor did any of these decisions disturb the Texas rule that the gas "should be valued as though it is free and available for sale." *Middleton, supra,* 613 S.W.2d at 246.

---

**3.** In *Middleton,* however, the Texas Court of Civil Appeals stated that *Vela's* comparability test simply did not apply to the federally controlled market, for there could be no "market value" in a price-regulated field. *See Exxon Corp. v. Middleton,* 571 S.W.2d 349, 362 n. 3 (Tex.Civ.App.1978).

Nevertheless, in its decision in *Weatherford,* citing the result in the Fifth Circuit's *Kingery* with approval, 622 S.W.2d at 80 n. 1, the Texas Supreme Court reiterated the *Middleton* enunciation of the determination of market value, 613 S.W.2d at 247, by using only comparables with the same "legal characteristics" of the natural gas in question, such as sales "in one particular category of a regulated market . . . with marketing outlets similar to the gas in question." *Weatherford, supra,* 622 S.W.2d at 81. This rationale, in our opinion, requires us, *Erie*-bound by Texas law, to reject Bowers' contention that the market value of regulated, interstate-dedicated natural gas shall be determined by treating the present gas production as though it was newly produced or otherwise available for higher price and thus free of the particular federal price-fixed category into which it falls because of the preexisting long-term contract.

Fuller reference to the federal regulatory scheme is now required, in order to explain our conclusion that the market value of natural gas produced under a long-term contract and dedicated to interstate use is fixed by the maximum allowable price for regulated gas of the same particular category, and that this is consonant with the pronouncements in *Vela* and *Middleton* that the market value is determined as though the gas were free of the contract and available for sale in the current market and not bound to the actual price paid under the long-term sales contract.

### B. *Effect of Federal Price Regulation*

The district court found that Phillips had at all times during gas production paid Bowers royalties based on the maximum lawful ceiling prices that could be charged for the gas from that geographic area that had been committed to interstate commerce under a long-term contract.[4] Bowers contends that if the gas were not committed to the long-term contract between Phillips and Natural; that is, treated "as though it is free and available for sale", *Middleton, supra,* 613 S.W.2d at 246, in the regulated market, the gas could command a higher price under federal law than the proceeds actually received from Phillips' sales to Natural under its long-term contract. For proof of comparable prices for "free and available" interstate gas, Bowers points to the maximum price ceilings imposed by the Natural Gas Policy Act on renewal, or "rollover," contracts between a producer and an interstate distributor, which permit higher prices to be charged for the gas than do the ceilings for gas sales contracts that have *not* expired by their own terms. Phillips, of course, maintains that interstate "rollover" gas sales from renewal contracts constitute a separate category under the Act, and thus are not comparable to interstate gas sales from existing contracts (a different category), such as the Phillips sales contract that formed the basis of royalties paid by Phillips to Bowers.

The Natural Gas Policy Act authorizes the FERC to implement maximum price ceilings for different categories of gas produced in the United States. The Act sets forth gas categories based on the timing of drilling, location of wells, and markets for gas, with resultant variations in the maximum lawful price of first sales of the gas from that particular source.[5] The gas pro-

---

4. From the date that natural gas has been produced for sale from the plaintiffs' properties, the applicable FPC opinions and provisions of the Natural Gas Policy Act, imposing maximum price ceilings on sales under the Phillips-Natural contract, are as follows: from January 24, 1973 to December 31, 1975, FPC Opinion 586, *codified at* 18 C.F.R. § 154.106 (1981); from January 1, 1976 to November 30, 1978, FPC Opinion 749, *codified at* 18 C.F.R. § 2.56b (1981); December 1, 1978 to December 31, 1980, section 104 of the Act, 15 U.S.C. § 3314 (1978), implemented by FERC regulations at 18 C.F.R. §§ 271.101 *et seq.* (1981).

5. These categories include recently discovered ("new") natural gas and certain gas produced from the Outer Continental Shelf, *see* 15 U.S.C. § 3312; new onshore production wells, § 3313; gas dedicated to interstate commerce as of November 8, 1978, § 3314; gas committed to intrastate commerce at that date, § 3315; interstate and intrastate "rollover contracts," § 3316; "high cost" natural gas produced from wells drilled over 15,000 feet in depth, § 3317;

duced from Phillips' wells and sold to Natural is regulated by 15 U.S.C. § 3314, which provides for maximum price ceilings for gas committed to interstate commerce on November 8, 1978. Section 3316, however, permits a different, higher, price ceiling for gas "that was previously subject to an existing [interstate] contract which expired at the end of a fixed term . . . whether or not there is an identity of parties or terms with those of the . . . existing contract." § 3301(12). In effect, the rollover provision requires that the gas retain its "interstate" status in subsequent sales, but permits it to be sold at a higher price than that of the prior interstate contract. *See, e.g.,* 18 C.F.R. § 271.101 (1981).

We cannot accept Bowers' contention that if the gas from its properties were "free [of the contract] and available for sale," the market value of the gas from its properties would be the price of rollover gas or of new gas. In *Middleton,* the Texas Supreme Court has held that only sales of gas of comparable quality may be used to prove market value, taking into account its *legal* characteristics and whether "it is sold in one particular category of the regulated market." *Middleton,* 613 S.W.2d at 246. The "particular category" of this gas is interstate gas under the maximum price ceilings of § 3314, not the "rollover" provision of § 3316, for there is no present lawful means by which the Phillips-Natural

contract could expire by its own terms, as required by federal regulations, or could otherwise be renewed or replaced and be subject to a higher ceiling as "rollover" gas.[6] It would be as unlawful to market this gas as "rollover" gas, outside its particular category under the Act, as it would be to sell it as "intrastate" gas.

The requirement under Texas law that market value be calculated as though the gas were "free and available for sale" has content under this interpretation. The lessee must base the lessor's royalties on comparable sales of gas with the same legal characteristics and subject to the price restraints of the particular category of the Act, and not solely on the actual proceeds obtained under the sales contract it has with the distributor. If Phillips were receiving *less* than the maximum ceiling price from Natural, which is permitted under the Act, *see* 15 U.S.C. § 3311(b)(9),[7] then *Middleton's* prescription that the gas should be considered "free and available for sale" would presumably permit Bowers to prove that comparable sales include existing interstate sales contracts that pay the maximum federal ceiling price.

### III. Conclusion

Under Texas law, "market value" is determined by comparable sales of natural gas subject to federal price regulation similar to that to which the gas here is subject,

"stripper wells," almost depleted wells, § 3318; and "other categories" not specifically described in the NGPA, § 3319.

6. The FPC, and now, the FERC, do not permit the parties to the gas sales contracts to consent to terminate existing contracts or modify terms so that new sales agreements become eligible for the higher maximum price ceilings as "rollover" or "replacement" contracts. *See, e.g., Zachary v. FERC,* 621 F.2d 155 (5th Cir.), *cert. denied,* 449 U.S. 1066, 101 S.Ct. 795, 66 L.Ed.2d 611 (1980) (FERC refused rollover status to a new sales contract undertaken by seller, who had terminated prior *twenty year contract* because of unilateral interpretation that gas could not be delivered in "commercial quantities" as required by contract); *Superior Oil Co. v. FERC,* 569 F.2d 971, 974 (5th Cir.), *cert. denied,* 439 U.S. 834, 99 S.Ct. 116, 58 L.Ed.2d 130 (1978) (contract provided that it would terminate if parties failed to renegotiate a new price

term in 1976; parties permitted termination and negotiated a new contract; FERC refused to extend new agreement rollover status because prior contract expired by virtue of an event within the control of the contracting parties); *Austral Oil Co. v. FPC,* 560 F.2d 1262, 1265–66 (5th Cir.1977) (parties amended term of twenty year gas sales contract so that it expired early; FPC would not categorize new contract as "rollover").

7. This section is a rule of general application to all categories of gas regulated by the Act, providing that in the case of "any price which is established under any contract for the first sale of natural gas and which does not exceed the applicable maximum price under [the Act] . . . , such maximum lawful price . . . shall not supercede or nullify the effectiveness of the price established under such contract."

for these legal restrictions limit the prices permitted in a transaction involving a willing buyer and willing seller. We therefore AFFIRM the district court's finding that, in the highly regulated market of natural gas sales, market value for royalty purposes cannot exceed the maximum ceiling price imposed on the gas within that particular federally regulated category. Since the plaintiff lessor-landowners were paid gas royalties on that basis, the district court correctly denied their claim for excess royalties based upon the higher market value of interstate gas produced and sold under other federally regulated categories.

AFFIRMED.