Anne Windfohr SOWELL, et al.

v.

**NATURAL GAS PIPELINE COMPANY OF AMERICA, A Corporation.**

Civ. A. No. 4–82–479–E.

United States District Court,
N.D. Texas,
Fort Worth Division.

Jan. 22, 1985.
Amended Judgment Feb. 15, 1985.

Kelly, Appleman, Hart & Hallman by Dee J. Kelly, Robert C. Grable, Wes Harris, Fort Worth, Tex., for plaintiffs.

Calvin, Dylewski, Gibbs, Maddox, Russell & Shanks by Dennis M. Dylewski, John L. Verner, Houston, Tex., for defendant; Jerome Mrowca, Midcon Corporation, Lombard, Ill., of counsel.

## MEMORANDUM OPINION

MAHON, District Judge.

This case involves a claim for alleged deficiencies in royalty payments under oil and gas leases between lessors, Anne Windfohr Sowell, individually, and W.A. Landreth, Edward R. Hudson, Jr., C.D. Williamson and George Young in their capacities as Trustee of the Mary Couts Burnett Trust, and lessee, Natural Gas Pipeline Company of America. The case came on for trial on July 12 and 13, 1984. After carefully considering the pleadings, the evidence and the arguments of counsel, the Court makes the following determination.

### I. Background

Defendant Natural Gas Pipeline, hereinafter called Natural, is either the named lessee or the successor in interest of the named lessee, Texoma Natural Gas Company, on leases covering almost 14,000 acres of land owned by plaintiffs in Carson and Hutchinson Counties, Texas. Natural produces gas from 32 wells, which have been in production since the 1930's. Approximately 8,300 acres were consolidated for operations pursuant to the 1945 Consolidation Agreement, as amended by the 1951 Amendment. The remaining 5,400 acres are covered by the Landergin/Blasdel lease. Royalty for gas production from the Landergin/Blasdel lease and all leases covered by the 1945 Consolidation Agreement is controlled by a Division Order executed on May 10, 1933 by the Mary Couts Burnett Trust and the S.B. Burnett Estate, as lessors, and Texoma Natural Gas Company, as lessee. Anne Windfohr Sowell succeeded to the one-half interest in lands covered by these leases that was formerly owned by the S.B. Burnett Estate on Janu-

ary 1, 1980. The Mary Couts Burnett Trust owns the remaining one-half interest.

Natural is the producer, gatherer and processor of natural gas from plaintiffs' lands. It gathers gas from the 32 wells, meters the gas near each wellhead and calculates plaintiffs' royalty share based on the metered volume. Between each of the 32 wellheads and gas meters is a drip pot, which collects small amounts of water and substances referred to as drips, condensate or natural gas liquids. These substances are components of the produced natural gas stream that, because of their molecular structure, tend to separate from the stream as liquids. The drips consist of heavier hydrocarbon molecules which take a liquid form when subjected to a mechanical separation process or to reduction in temperature or pressure.

In addition to the 32 drip pots located at the wellhead, the drips are separated as the gas passes along Natural's pipeline and again at processing plants. After the gas is metered at the wellhead, it is gathered and compressed at booster stations operated by defendant along lateral pipelines, before entering defendant's main line, the 24-inch Gray County line. The gas is transported through the Gray County line and metered at Natural's processing plant in Fritch, Texas and is then transmitted to a processing plant in Stinnett, Texas, where it is processed and additional condensate and natural gas are recovered. In addition to the 32 drip pots located between wellhead and the gas meter at each well, there are approximately 118 drip vessels along defendant's lateral lines and the Gray County line.

The condensate collected in Natural's drip collectors has been sold on a per barrel basis to UPG, Inc. since October 1982. UPG collects the condensate throughout Natural's gathering system and hauls it by truck to central tank batteries, where water and condensate are separated. After separation, UPG sells the condensate and compensates Natural for the value of the condensate based on a percentage of the applicable posted price for crude petroleum

oil. Before 1982 the condensates had been collected by Tadco, Inc.

The liquid products separated from the gas stream at Natural's processing plants in Fritch and Stinnett, Texas are sold to Phillips Petroleum Company, RM, Inc. and Getty Oil Company on a per gallon basis. The residue gas is transported through Natural's pipeline system and sold to customers concentrated in the area of Chicago, Illinois for home heating.

The sale of condensates has become a commercially viable enterprise only within the last ten years. During the 1920's, 1930's and 1940's drips were separated from the gas stream in small quantities which had little or no market value. Because the drips could be used as automobile fuel, defendant's practice was to grant permits to individuals to gather drip liquids without charge. When this practice was outlawed by Environmental Protection Agency regulations, it became customary to enter agreements with drip contractors by which the contractor was allowed to keep all saleable drips without charge in exchange for collecting those drips which were produced in such small quantity as to have little, if any, value.

In the mid-1970's Natural began to sell the condensates, when their sale became profitable largely because of two factors. At that time the market price began to rise as a result of the world-wide energy shortage. In addition, production of the condensates increased. As gas resources became depleted, the natural pressure of the gas in the reservoir was no longer sufficient to force the gas along the pipeline to the processing plants. It became necessary to compress the gas along the pipeline by pumping it to a high pressure, which caused additional quantities of condensate to drop from the stream.

Defendant pays royalty to the plaintiffs on the basis of the volume of natural gas metered at the wellhead. The gas in issue has been dedicated to interstate commerce throughout the period relevant to this suit. Since 1978 defendant has paid royalties for all gas produced from plaintiffs' land based

on the Unit Value specified in Opinion 749 of the Federal Power Commission, now the Federal Energy Regulatory Commission, and Section 104 of the Natural Gas Policy Act of 1978, 15 U.S.C. § 3301, *et seq.*, which sets a ceiling price for the first sale of "old flowing gas." After metering the gas defendant adjusts the royalty rate based on the BTU content of the gas. The BTU content, which refers to British Thermal Unit, is a measure of the heat content of the gas. For a variance in the BTU content either above or below the standard of 1,000 BTU's per cubic foot, Natural increases or decreases plaintiffs' royalty payments proportionately, based on the gas rate paid.

The BTU adjustment to a limited extent compensates plaintiffs for the heavier hydrocarbons contained in the natural gas stream. However, plaintiffs receive no additional royalties for the drips, condensates and natural gas liquids separated and sold by defendants.

## II. Computation of Natural Gas Royalties

Plaintiffs assert that they are entitled to the payment of royalties based on the average market price that is paid for gas in a six county area, pursuant to the 1933 Division Order. It is their contention that the average market price must be computed by considering all sales of gas, including both intrastate and interstate sales and sales of gas in all categories under the Natural Gas Policy Act. Defendant now pays plaintiffs a royalty based only on the market price in the six county area of Section 104 gas, the category of "old flowing gas" to which plaintiffs' gas has been assigned by federal regulation.

The 1933 Division Order provides, in pertinent part, for the payment of gas royalty as follows:

You are hereby authorized ... to pay royalty for sulphur-free gas produced in its natural state from said well or wells ... at the following rates ... for the remaining life of this contract ... *one-eighth (⅛) of the average market price per thousand cubic feet that is paid for*

*gas in Carson, Hutchinson, Potter, Moore, Gray and Wheeler Counties, Texas.*

The standard test for determining the market value of gas sold on the interstate market is

[W]hat ... a willing seller and a willing buyer in a business which subjects them and the commodity to restriction and regulation, including a commitment for a long period of time, agree to take and pay with a reasonable expectation that the FPC [now the FERC] would approve the price (and price changes) and other terms and then issue the necessary certificate of public convenience and necessity.

*Weymouth v. Colorado Interstate Gas Company,* 367 F.2d 84, 90 (5th Cir.1966).

In *Bowers v. Phillips Petroleum Co.,* 692 F.2d 1015, 1017 (5th Cir.1982) the Fifth Circuit noted that federal price controls have "somewhat distorted" the willing-buyer, willing-seller method of determining market value. Until 1978 the price of natural gas in interstate commerce was regulated through orders by the Federal Power Commission. The Natural Gas Policy Act of 1978, 15 U.S.C. §§ 3301, *et seq.,* established the Federal Energy Regulatory Commission which is authorized to set maximum price ceilings on gas sold in both interstate and intrastate commerce. The FERC categorizes the gas based on its physical characteristics, geographic location, drilling date and when and what market to which the gas was committed to sale. Maximum ceiling prices for the first sale of the gas by the producer to distributors are set for each category, dependent primarily on the expenses incurred in producing the gas. The FERC has no authority to regulate the amount of royalty paid by the producer to the lessor, which remains a matter of contract between the parties. *Flowers v. Diamond Shamrock Corp.,* 693 F.2d 1146 (5th Cir.1982). However, federal regulation determines the amount at which the gas may be sold and therefore indirectly affects royalties based on a percentage

of the market value of the gas when sold. *Bowers, supra* at 1017.

■ The Texas courts and the Fifth Circuit have developed the requirement that only sales of "comparable" gas be considered in determining market value. In a case concerned only with intrastate sales of gas, the Texas Supreme Court held that the market value of gas "is to be determined by sales of gas comparable in time, quality and availability to marketing outlets." *Texas Oil & Gas Corp. v. Vela,* 429 S.W.2d 866, 872 (Tex.1968), citing *Phillips Petroleum Co. v. Bynum,* 155 F.2d 196 (5th Cir. 1946). In *Exxon Corporation v. Middleton,* 613 S.W.2d 240 (Tex.1981) the Texas Supreme Court further defined "comparability" of sales to reflect "not only similar physical properties, but also [to include] the 'legal characteristics' of the gas: whether it is sold in a regulated or unregulated market, or in one particular category of a regulated market." Accordingly, the sales of unregulated, intrastate gas are not comparable sales on which to base the market value of gas dedicated to the regulated interstate market. *First National Bank in Weatherford v. Exxon Corporation,* 622 S.W.2d 80, 81–82 (Tex.1981).

■ The Fifth Circuit has further refined the definition of legally comparable sales of gas in interstate commerce to mean that market value cannot exceed the maximum ceiling price for gas within the particular federally regulated category to which the gas has been assigned. Sales of gas in other federal categories are not comparable sales to be considered in determining market value. *Bowers v. Phillips Petroleum Co. supra.*

Throughout the period relevant to this suit, from November 12, 1978, which was four years preceding the filing of this suit, to the present, defendant has paid plaintiff royalties at the maximum ceiling price for "old flowing gas" under Opinion 749 of the Federal Power Commission or under Section 104 of the Natural Gas Policy Act. It is defendant's position that this is a garden variety market value case limited only by the geographic parameters of the six county area. Accordingly, the viability of plaintiffs' claim for alleged deficiency in royalty payments hinges on their contention that the lease in question is not a "market value" lease requiring consideration only of sales of comparable gas. Should the Court determine this to be a market value case, the parties acknowledge that the royalties have been computed properly based on comparable interstate sales of "old flowing gas."

The terms "market price" which is contained in the royalty clauses in issue and "market value" have on occasion been distinguished by some courts. However, other courts have used the terms interchangeably. *J.M. Huber Corporation v. Denman,* 367 F.2d 104 (5th Cir.1966); *Arkansas Natural Gas Company v. Sartor,* 78 F.2d 924 (5th Cir.1935), *cert. denied,* 296 U.S. 656, 56 S.Ct. 381, 80 L.Ed. 467 (1936). The Court need not determine whether the terms are equivalent because plaintiff does not seek to distinguish this case from the market value cases on that basis.

Plaintiffs base their contention that they are entitled to payment of royalties determined by the average price of all sales of gas in the six county area, including intrastate sales and sales in all categories under the Natural Gas Policy Act, on the particular wording of the royalty clause, which they assert can be distinguished from market value lease provisions. The basis of their claim is that, in contrast to a typical market value lease provision where the aim is to compute the value of the gas being sold, the Division Order provides for calculation of the average six county price, without reference to the value of the gas recovered from plaintiffs' land. Such wording, plaintiffs argue, renders the rationale for the comparability requirement inapplicable.

In each market value case which has been cited to the Court, the courts looked to the language of the royalty clause of the lease being construed to determine the proper measure of royalties:

*Exxon v. Middleton, supra:* "... on gas, including casinghead gas or other

gaseous substances, *produced from said land* and sold or used off the premises or in the manufacture of gasoline or other product therefrom, shall be the *market value at the well of one-eighth of the gas so sold or used,* provided that on gas so sold at the wells the royalties shall be one-eighth of the amount realized from such sale ..." 613 S.W.2d at 242.

*Bowers v. Phillips Petroleum Co., supra:* "... on gas, including casinghead gas or other gaseous substance, *produced from said land* and sold or used off the premises or in the manufacture of gasoline or other product therefrom, the *market value at the well of one-eighth of the gas sold or used,* provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale ..." 692 F.2d at 1016.

*Flowers v. Diamond Shamrock Corp, supra:* "... on gas, including casinghead gas or other gaseous substances, *produced from said land* and sold or used off the premises or for the extraction of gasoline or other product therefrom, the *market value at the well of one-eighth of the gas so sold or used* ..." 693 F.2d at 1149.

*Brent v. Natural Gas Pipeline Company of America,* 626 F.2d 1261 (5th Cir.1980): "... the *market value* (emphasis by the Court) *at the well of one-eighth (⅛) of the gas produced, saved, and sold or used off the leased premises* ..." Id. at 1262.

*Hawley v. Natural Gas Pipeline Co. of America,* 626 F.2d 1261 (5th Cir.1980): "... the *market value* (emphasis by the Court) *at the well of one-eighth (⅛) of the gas produced, saved, and sold or used off the leased premises.*" Id.

*Kingery v. Continental Oil Co.,* 626 F.2d 1261 (5th Cir.1980): "... on gas, including casinghead gas or other gaseous substance, *produced from said land* and sold or used off the premises or in the manufacture of gasoline or other product therefrom, *the market value at the well of one-eighth of the gas so sold or used,* provided that on gas sold at the wells the royalty shall be one-eighth of

the amount realized from such sale ..." Id at 1263.

(Emphasis added.)

Each of the clauses cited provides for payments to be made based on the "market value" of the gas produced from the lease in question, reflected by reference to gas "produced from said land" or gas "produced, saved, and sold or used off the leased premises." Accordingly, in order to determine the market value of such gas, reference must be made only to sales of gas in the same federal pricing category. As the Fifth Circuit stated in *Kingery v. Continental Oil Co., supra,* the market value of gas dedicated to interstate commerce may be computed only by comparison with other sales of interstate gas "because this gas could not be sold on the intrastate market and thus its value on that market was zero." Accordingly, the market value of gas assigned to other federal price categories is irrelevant because the gas at issue could not be sold at that price.

By requiring that only physically and legally comparable sales of gas be considered in determining market value, the Texas courts and the Fifth Circuit have recognized that market value of particular gas can be no higher than the maximum federal ceiling for such gas. However, the language of the 1933 Division Order before this Court can be distinguished from the market value royalty provisions because it does not refer to the market value of gas "produced from said land" or gas "produced, saved, and sold or used off the leased premises." Rather, it provides for payment of royalties based on "the average market price per thousand cubic feet that is paid for gas in Carson, Hutchinson, Potter, Moore, Gray and Wheeler Counties." In this case the lease provides that the royalty is to be calculated not on the basis of the market value of plaintiffs' gas but on the basis of an objective calculation of the average six county price. Therefore, the rationale behind consideration of only comparable sales is not applicable.

The Court finds that the royalty provision is clear and unambiguous. Accordingly, the Court may not consider extrinsic evidence reflecting the parties' construction of the provision. *Sun Oil Co. v. Madeley,* 626 S.W.2d 726, 732 (Tex.1982); *Lewis v. East Texas Finance Co.,* 136 Tex. 149, 146 S.W.2d 977, 980 (1941). "The Texas cases are ... clear to the effect that, when a contract is so worded that it is not fairly susceptible of more than one legal meaning, it cannot be rendered ambiguous by a consideration of surrounding circumstances." *Standard Oil Co. of Texas v. Lopeno Gas Co.,* 240 F.2d 504, 508 (5th Cir.1957).

■ After examining the royalty provision, those royalty provisions contained in the "market value" comparability cases and the applicable law, the Court finds that defendant may not confine itself to sales of gas in Section 104 in computing plaintiffs' royalty payments. Effective November 12, 1978 Plaintiff is entitled to a royalty based on the average market price of *all* gas sold in the six county area including all intrastate sales and all interstate sales.

### III. Entitlement to Royalties on Natural Gas Liquids

Plaintiffs seek to recover a royalty share of the value realized by defendant from the sale of condensate and natural gas liquids, which are removed from the natural gas stream in drip pots located at the wellhead and along the main and lateral pipelines and at processing plants located at Fritch and Stinnett, Texas. Plaintiffs assert a right to recover the amount by which the drips, condensate and natural gas liquids produced from their land after November 12, 1978, less the reasonable costs of extraction, exceeds the BTU adjusted royalty paid plaintiffs on the hydrocarbons represented by the drips, condensate and natural gas liquids. The relevant language in the 1933 Division Order is as follows:

> You are hereby authorized ... to pay *royalty for sulphur free gas produced in its natural state* from said well or wells ... at ... one-eight (⅛) of the average market price per thousand cubic feet that is paid for gas in Carson, Hutchinson, Potter, Moore, Gray and Wheeler Counties, Texas.

It is undisputed that the value of heavier hydrocarbons represented by the liquids are, in some measure, compensated for by the BTU adjusted royalty payment made to the plaintiffs. However, defendant acknowledges that the royalty paid plaintiffs reflects only a fraction of their proportionate royalty share of the total sale proceeds of the liquids.

It is plaintiffs' position that they are entitled to royalties for the component elements of the natural gas stream as a matter of law. They assert that nothing in the 1933 Division Order governs the payment of royalty on the drips and condensates because they are sold as liquids rather than as gas. Accordingly, plaintiffs assert that in order to determine the method of payment for royalty on natural gas liquids, reference must be made to the leases covering the properties governed by the Division Order. Plaintiffs contend that each of the leases, which are either "proceeds" or "in kind" leases, specifically or indirectly provides for the payment of royalty for liquids.[1]

The benchmark case. on the issue of whether a grant of "gas" includes a grant

---

**1.** For example, the royalty clause in the Texas Co. lease recorded at v. 25, p. 475 in the Deed Records of Carson County, Texas provides:

⅛ of the sum total of the oil or gas produced and saved from said premises ...

The Blasdel Leases provides for royalty on: One-eighth (⅛) part of the total that is mined, produced and saved from the said premises and as much more as may be deemed fair and reasonable by agreement of the parties hereto

....

The Gulf Production Co. lease, recorded at v. 29, p. 505 provides:

⅛ of the proceeds received from the gas at the mouth of the well for each well where gas only is found ...

for gas produced from any oil well and used off the premises at the rate of ⅛ of the proceeds, at the mouth of the well ...

of all component elements of the gas, including liquid hydrocarbons recovered from the gas stream, is *Lone Star Gas Co. v. Stine*, 41 S.W.2d 48 (Tex.Comm'n.App.— 1931, no writ). There, the court considered the claim that the sale of natural gas did not include the sale of gasoline which was removed from the gas stream through compression and changes in temperature, much as the natural gas liquids are removed from the gas stream in the case at hand. In rejecting the claim, the Court held:

> The legal effect of the deed was to convey "all natural gas," and by the term "natural gas" is meant all the constituent elements composing the gas. The gas company, having become the owner of "all natural gas" in or under this land, has the right to make such use thereof as it sees fit. It may sell the gas in its natural form as it comes from the earth, or it may split it into its constituent elements and sell such elements, including the gasoline.

*Id.* at 49. *Stine* involved the sale of minerals, rather than a lease as is present here. However, the court in *Stine* relied on a decision of the Texas Commission of Appeals in *Humble Oil & Refining Co. v. Poe*, 29 S.W.2d 1019 (Tex.Comm'n.App. 1930, no writ) in which the court reached the same result in a case concerning a lease of mineral rights. There, the court held:

> Plaintiff in error acquired the right to use the gas produced from a gas well it might drill on the premises covered by the lease by the payment of the agreed rental of $250 per annum. Having bought and paid for such gas it owned the same, including all of its constituent elements, and therefore had the lawful right to make such use of it as it might deem proper.

*Id.* at 1020.

In *O'Neal v. Union Production Co.*, 153 F.2d 157 (5th Cir.) *cert. denied*, 329 U.S. 715, 67 S.Ct. 46, 91 L.Ed. 621 (1946), the plaintiffs asserted that in addition to royalties based on the market price of the gas they were entitled to royalties on liquids extracted from the gas. In entering summary judgment against plaintiffs on the alleged royalty deficiencies for liquids, the court held:

> The gasoline extracted by the defendant is not casinghead gas, but is merely the gasoline content of the natural gas as it comes from the earth. It is an element of, or a constituent part of, natural gas, and the purchase of the natural gas at the well carried with it all of its constituent parts and the right to separate or extract any of its elements. *The royalties provided for in the contract were for the gas and not for the gas and also for any elements that might later be taken by some artificial process from that gas.*

*Id.* at 158 (emphasis added). The *O'Neal* court relied on *Union Producing Co. v. Pardue*, 117 F.2d 225 (5th Cir.1941) as support for its holding. In *Pardue*, the court had earlier held that "gas" means natural gas, including all of its contents, and that the sale of gas carries to the purchaser all of its contents. Although both *Pardue* and *O'Neal* were Louisiana cases, *Pardue* treated Texas law as controlling authority, citing *Stine* and *Poe*.

Plaintiffs seek to distinguish *Stine* on the ground that it concerned a sale of minerals rather than a lease. However, as the court in *Stine* recognized, the questions of law are the same, whether the natural gas has been sold or merely leased.

The decision in *Scott Paper Co. v. Taslog*, 638 F.2d 790 (5th Cir.1981) does not stand for the proposition that a grant of "gas" confers a right to royalties for all components produced from the gas stream. In *Taslog* the dispute centered on a lease which provided for the payment of royalties "on gas including casinghead gas and other gaseous substance produced from the premises." The issue was whether the royalty owner was entitled to royalties on hydrogen sulfide gas, as well as on hydrocarbon gases. The court held that, absent an express reservation, a grant of "gas" encompasses all component *gases* of the total gas stream, including both hydrocarbon and non-hydrocarbon gases. *Taslog* is not

dispositive on the issue presented here, whether a grant of royalties on "gas" conveys the right to recover royalties on the liquid hydrocarbons subsequently separated from the gas stream.

Neither do *Northern Gas Co. v. Grounds,* 441 F.2d 704 (U.S.Ct.Cl.1971), *Navajo Tribe of Indians v. United States,* 364 F.2d 320, 176 Ct.Cl. 502 (1966) and *Ashland Oil Co., Inc. v. Phillips Petroleum Co.,* 554 F.2d 381 (10th Cir.1975) support plaintiffs' claim to royalties on liquid hydrocarbons. These cases provide only that, absent an express reservation, the term "gas" is not limited to hydrocarbon gases but also includes helium gas.

Finally, in *Hemus v. Hawkins,* 452 F.Supp. 861, 866 (S.D.Tex.1978) the court held that plaintiffs were entitled to claim royalty rights in plant products, noting:

> There is no reason, in the Court's judgment, why the plant product should be treated in anyway differently from the condensate which is removed at the field separator.

However, in that case the parties had agreed that plaintiffs were entitled to a one-eighth royalty interest in the market value of condensate removed from the gas by a field separator. No such agreement is present here.

Plaintiffs assert that because the Division Order sets forth a basis for royalty payments according to the average price that is "paid for gas," the payment of royalty for any substance which is produced as gas but not sold as gas is not governed by the Division Order. Plaintiffs assert that the royalty provisions in the underlying leases govern the payment of royalties on those constituent elements of the gas which are produced as gas but sold as liquids, including the drips, condensate and natural gas liquids.

The Court finds this argument to be unpersuasive. By the plain language of the royalty clause, plaintiffs are entitled to royalty *for sulphur free gas produced.* It is undisputed that the natural gas liquids are produced as gas and, except for small amounts of drip collected in 32 drip pots at the wellhead, are reduced to liquids only after they are compressed in the pipeline or processed at the Fritch and Stinnett plants. Defendant's royalty obligation is triggered by the *production* of gas, not the *sale* of gas. Defendant meters the gas at the wellhead and pays plaintiffs their royalty share, plus a BTU adjustment which accounts in part for the heavier hydrocarbons present in the gas stream.

Defendant has no further obligation to compensate plaintiffs for the liquid hydrocarbons that are subsequently removed from the natural gas stream. To find that the Division Order describes the substances on which royalties must be paid and the method of payment for natural gas, but not the method of payment for liquids, puts a strained construction on what the Court finds to be a clear, unambiguous royalty provision. The parties were free to draft a royalty provision granting royalties for liquid hydrocarbons produced from the gas stream. However, they did not do so. The Court considered the plain meaning of the Division Order in determining that plaintiffs are entitled to payment of royalties based on all sales within the six county area. By applying the same approach to the claim for additional royalties for liquids, the Court concludes that the Division Order does not confer a right to recover such royalties.

In the alternative, should the Court find that defendants have complied with the royalty provision by paying plaintiffs for the value of the liquids on the basis of the BTU adjusted royalty rate, plaintiffs assert that defendant breached an implied covenant to deal in good faith, by intentionally and knowingly inducing plaintiffs to enter an agreement which denied them liquid royalties under the leases.

In *Amoco Production Co. v. First Baptist Church of Pyote,* 579 S.W.2d 280 (Tex. Civ.App.—El Paso 1979, writ ref'd n.r.e.) it was held that all oil and gas leases contain "an implied covenant to exercise good faith in the marketing of gas, and particularly where the interests of the lessor and lessee are not identical." *Amoco* involved a les-

see which dedicated itself to a long term contract to sell gas at approximately one-half of the price at which gas was regularly being sold to other purchasers. The court held that the lessee breached an implied covenant to market natural gas at a fair market value.

*Amoco,* which concerns a duty of good faith in marketing, is not dispositive of plaintiffs' claim of breach of duty by the defendant in the formation of the Division Order. The Court finds that the parties made an agreement at arms' length. Defendant, as lessee, had no duty to maximize the lease benefits to plaintiffs, as lessor, in the negotiation and execution of a lease document. The parties are free to reach any terms that are mutually acceptable.

 Accordingly, the Court finds that, by making a BTU adjusted royalty payment on natural gas metered at the wellhead, defendant has complied with the royalty provision of the Division Order. Because the drips collected in the 32 drip pots located between each well and its meter are not metered for purposes of calculation of royalties, plaintiffs are entitled to a royalty on such drips. However, defendant has no further obligation to pay plaintiff additional royalties based on the sale price of natural gas liquids, drips and condensates subsequently separated from the gas stream.

### IV. Termination of Landergin/Blasdel Lease

Plaintiffs assert that the Landergin-Blasdel lease should be terminated, pursuant to the express "termination for breach" clause contained in the lease. The lease, which was entered into on April 24, 1919 by S.B. Burnett, lessor, ("Party of the First Part") and P.H. Landergin and Eugene B. Blasdel, lessees, ("Parties of the Second Part") provides in pertinent part:

It is further agreed that failure on part of Parties of the Second Part and their assigns strictly to keep and observe the terms, covenants, conditions and requirements, or any one of them, on their part to be kept shall entitle Party of the First Part of (sic) his assigns, at his option, at

the time of such breach, or at anytime thereafter, to terminate this contract and re-enter upon said premises without notice of any kind. Provided however that before advantage is taken of any such breach that notice thereof shall be served on Parties of Second Part or their agents in charge and reasonable time allowed within which to correct the conditions of which complaint is made.

On July 15, 1983 plaintiffs advised defendant by certified letter that defendant had breached the terms of the Landergin/Blasdel lease by failing to pay royalties based on the six county average gas price specified in the 1933 Division Order and by failing to pay royalties for liquid hydrocarbons extracted from the natural gas stream. Plaintiffs further advised defendant that defendant was given until September 1, 1983 to correct such breaches and, should defendant fail to do so, plaintiffs would terminate the lease as of September 1, 1983. Plaintiffs now seek termination of the Landergin/Blasdel lease and damages in the amount equal to the difference between the royalty due under this judgment for gas produced from the Landergin/Blasdel lease after September 1, 1983 and the full proceeds received by defendant, less their operation costs.

 Under Texas law, parties to a contract may agree to the remedy to be applied in the event of breach. The remedy will be enforced by the courts so long as it is not illegal or against public policy. *Shasteen v. Mid-Continent Refrigerator Co.,* 517 S.W.2d 437 (Tex.Civ.App.—Dallas 1974, writ ref'd n.r.e.). The Landergin/Blasdel lease provides that the lessor, upon reasonable notice, may elect to terminate the lease upon the failure by the lessees or their assigns strictly to observe the terms, covenants, conditions or requirements of the lease. The parties have stipulated that the 1933 Division Order constitutes an amendment to the Landergin/Blasdel lease. Royalties for lands covered by the lease are determined by reference to the royalty clause of the 1933 Divi-

sion Order, which the Court has found to have been violated by defendant.

■ The Court finds that defendant has failed strictly to observe the terms, covenants, conditions or requirements of the lease by failing to compensate plaintiffs fully for royalties on the basis of the six county average sales price. The Court further finds that plaintiffs complied with the terms of the lease by giving defendant notice and a reasonable time to remedy the breach. Accordingly, the Court holds that the Landergin/Blasdel lease shall be terminated as of September 1, 1983. Plaintiffs are entitled to recover the difference between all proceeds attributable to gas produced from wells on the Landergin/Blasdel lease since that date, less defendant's reasonable costs of operation, and the royalties awarded under this judgment for gas produced from the Landergin/Blasdel lease.

### V. Attorneys' Fees

■ Article 2226, Tex.Rev.Civ.Stat. authorizes an award of attorneys' fees for suits founded on oral or written contracts. *Tuthill v. Southwestern Public Service Company,* 614 S.W.2d 205 (Tex.Civ.App.— Amarillo 1981, writ ref'd n.r.e). A plaintiff may receive attorney's fees when he recovers only a portion of his claim. *Anahuac, Inc. v. Wilkes,* 622 S.W.2d 634 (Tex.App.— Austin 1981, no writ). The court has broad discretion in setting the amount of attorneys' fees to be awarded. *Espinoza v. Victoria Bank & Trust Co.,* 572 S.W.2d 816 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.). The parties have stipulated that plaintiffs have incurred reasonable attorneys' fees of $185,000.00 through trial and further stipulate that plaintiffs' attorneys' fees in connection with an appeal would not exceed $35,000.00. Plaintiffs' attorneys further stipulated that approximately one-half of their attorneys' fees have been incurred in connection with the question of the royalties on gas due under the 1933 Division Order and the remaining one-half on plaintiffs' claims for royalty on liquid hydrocarbons.

■ Based on the stipulations of the parties and the fact that this Court has found that the plaintiffs prevailed on one out of the two issues raised in this case, the Court finds the counsel for plaintiffs are entitled to recover attorneys' fees in the amount of $92,500.00 for work done in connection with trial of the case and $17,-500.00 for work performed in connection with an appeal, in the event that an appeal is filed by defendant.

### VI. Prejudgment Interest

■ The plaintiffs have applied to this Court for prejudgment interest at the rate of 6% and alternatively at the rate of 12%. The well-settled rule in Texas is that interest is recoverable as a matter of right from the date of the injury or loss, where damages are established as of a definite time and the amount thereof is definitely ascertainable. *Union Bank of Benton, Arkansas v. First National Bank,* 677 F.2d 1074, 1076 (5th Cir.1982) (citations omitted). It is sufficient if the measure of recovery, not necessarily the amount of damages, is fixed by conditions existing at the time the injury arose. *Pickens v. Alsup,* 568 S.W.2d 742, 743 (Tex.Civ.App.— Austin 1978). The Court is aware that prejudgment interest is not awarded in all cases involving a gas royalty dispute. *See, e.g., Exxon Corp. v. Middleton,* 613 S.W.2d 240, 252 (Tex.) on remand, 619 S.W.2d 477 (Tex.Civ.App.1981). However, the Court finds that in this case the damages were established at a definite time and that the amount of damages was definitely determinable. Depending on the ruling made by the Court, damages would be either nothing or the difference between the royalties paid and the average market price paid for all sales of gas in the heretofore listed six-county area.

■ As previously stated, the plaintiffs have requested prejudgment interest at the rate of 12%. The rate of prejudgment interest has been held to be a matter within the sound discretion of the trial judge. *First City National Bank of Paris v.*

*Haynes,* 614 S.W.2d 605 (Tex.Civ.App.— Texarkana 1981, no writ). The Court finds that the rate of 6% as recited in Tex.Rev. Civ.Stat.Ann. art. 5069, 1.03 is reasonable under the fact situation in this case and chooses not to award a higher rate, as requested by the plaintiffs.

## VII. Conclusion

The Court finds that plaintiffs are entitled to recover additional royalties due from and after November 12, 1978 in the amount of $3,655,256.26, which represents the difference between the royalties paid and the average market price paid for all sales of gas in Carson, Hutchinson, Potter, Moore, Gray and Wheeler Counties, Texas. All future royalties are to be calculated on the same basis.

The Court finds that plaintiffs are entitled to recover royalties for drips collected directly at each wellhead before the gas is metered. The parties are directed to reach an agreement for compensating plaintiffs for their royalty interest in such drips. The Court further finds that defendant has no additional obligation to pay royalties to plaintiffs for components subsequently removed from the gas stream and sold as liquids.

The Court further finds that the Landergin/Blasdel lease terminated as of September 1, 1983. Plaintiffs are entitled to recover the difference between the royalty due under this judgment for gas produced from the Landergin/Blasdel lease after September 1, 1983 and the full proceeds received by defendant, less defendant's reasonable operation costs.

The Court further finds that plaintiffs are entitled to attorneys' fees in the amount of $92,500.00 for trial and $17,500.00 in the event of an appeal by defendant.

The Court further finds that the plaintiffs are entitled to prejudgment interest at the rate of 6% in the amount of $572,364.56 and post-judgment interest at the rate of 9.09%, as provided by law.

Judgment will be entered accordingly.

## AMENDED JUDGMENT

This action came on for trial before the Court, the Honorable Eldon B. Mahon, U.S. District Judge presiding, and the issues having been duly tried and a memorandum opinion having been issued,

It is ORDERED and ADJUDGED that the Plaintiffs Anne Windfohr Sowell, Individually, and W.A. Landreth, Edward R. Hudson, Jr., C.D. Williamson, and George Young, in their capacities as Trustees of the Mary Couts Burnett Trust, recover of the Defendant Natural Gas Pipeline Company of America the sum of $4,819,476.24, which represents $4,089,262.88 in additional gas royalty from November 12, 1978 through December 31, 1984 and $730,213.36 in prejudgment interest through January 21, 1985, at the rate of 6 percent,

It is further ORDERED and ADJUDGED that the plaintiff recover royalties for drips collected directly at each wellhead before the gas is metered,

It is further ORDERED and ADJUDGED that the plaintiffs recover of the defendant the sum of $92,500.00 in attorneys fees and their costs of action, and that in the event of an appeal by the defendant, the plaintiffs recover of the defendant the sum of $17,500.00 in attorneys fees,

It is further ORDERED and ADJUDGED that the plaintiffs recover of the defendant postjudgment interest at the rate of 9.09 percent, as provided by law,

It is further ORDERED and ADJUDGED that the Landerin/Blasdel lease terminated as of September 1, 1983, and that the plaintiffs are entitled to recover the difference between the royalty due under this judgment for gas produced from the Landergin/Blasdel lease after September 1, 1983 and the full proceeds received by defendant, less defendant's reasonable operation costs.

It is further ORDERED and ADJUDGED that all future royalties to plaintiffs for months after the months represented by the Judgment under the leases in question be calculated on the basis of the

average market price paid for all sales of gas in Carsen, Hutchinson, Potter, Moore, Gray and Wheeler Counties, Texas.

All relief requested by the plaintiffs and not granted expressly herein, is hereby denied.